# UNITED STATES v. COPLON.

## No. 86, Docket 21790.

United States Court of Appeals
Second Circuit.

Argued Nov. 2, 1950.

Decided Dec. 5, 1950.

See also 91 F.Supp. 867.

Samuel A. Neuburger, Sidney S. Berman, and Leonard B. Boudin, New York City, for appellant.

Fred E. Strine, Washington, D. C., James M. McInerney, Asst. Atty. Gen., Irving H. Saypol, U. S. Atty., New York. (Raymond P. Whearty, Special Asst. to the Atty. Gen., Rosalie M. Moynahan, Atty., Department of Justice, Washington D. C., of counsel), for appellee.

Before L. HAND, Chief Judge, and SWAN and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The appellant, Judith Coplon, was convicted of an attempt to deliver "defence information" to a confederate, Gubitchev (Count 4); and she and he were convicted of conspiring to defraud the United States by making copies of documents relating to the national defence, by transmitting them to Gubitchev, and by removing and concealing them (Count 1). She was acquitted on a count, similar to Count 4, of attempting to transmit the same documents to Gubitchev (Count 2). The principal points raised upon the appeal are three: (1) the competence as evidence of certain documents found upon her person when she was arrested; (2) whether the prosecution proved that "taps" of her wires, conceded to have been made, did not "lead" to any part of the evidence on which she was convicted; (3) whether she was cut short in her effort to prove that telephone talks to which she was a party had been intercepted before the time when the conceded "taps" began to be made. One or two other questions we shall summarily discuss in advance of these; but it will first be necessary to state an outline of the evidence that was before the jury.

Judith Coplon had been employed by the United States Department of Justice in New York from June 15th, 1943, until January 16th, 1945, when she was transferred to Washington to the position of "political analyst" in the "Section" which

had charge of the registration of foreign agents. Reports of agents of the Federal Bureau of Investigation concerning "internal security" did not come to this section but to another, the Internal Security Section, to which in October, 1948, she was temporarily assigned for the examination of some of such reports. She continued at this until the beginning of 1949, by which time one, Foley, who was in charge both of the registration and the security sections had been told that she was under suspicion. Foley put an end to her work in the security section and thereafter confined her to the registration section. She protested against this as a slight upon her ability, and early in February went to her successor in the security section, asked to see some of the reports that were filed there, and took away some of them; and soon afterwards she asked the successor to send her any such reports that concerned foreign embassies or the like, particularly any relating to Russian agents. Early in January Foley mentioned to her a report about Russian agents which she twice asked to see, but which he each time refused to show her because it was a "top secret." The other and most important part of the evidence upon which she was convicted consisted of three trips to New York, the first, on January 14th; the second, on February 18th; and the third on March 4th. In each case she announced her intention in advance to Foley and got his consent; and on each she was shadowed by agents of the Federal Bureau of Investigation, who managed to keep her pretty continually, though not always, under observation. On the first trip she met Gubitchev, obviously by prearrangement, and they were together for some time, but, so far as any of the agents could see, no papers passed from her to him. The second meeting was in the same general locality as the first—upper Broadway in Manhattan—and again the agents saw nothing pass, although at one time Gubitchev seemed to reach in front of her body and may have got his hand in her purse which was open. The third meeting did not greatly differ from the other two, except that both appeared to be acting with even more circumspection

than before. At about 9:30 P.M. they were both arrested without a warrant; and, when her purse was opened, there was found in it a sealed packet containing many incriminating documents, which she would almost certainly not have been carrying to such an interview, were she not intending to pass them to Gubitchev On all three occasions the two had wandered aimlessly about, meeting, separating, rejoining, going hither and yon, continually looking back, and in general giving every appearance of persons who thought they might be shadowed and wished to escape being trailed.

Among the documents in the packet was a decoy letter prepared by one, Lamphere, an agent of the Bureau, which professed to give information about the Russian trading corporation, "Amtorg," and which Foley had given her on March 4th, telling her that it was "hot and interesting." Besides the decoy, the documents included many "data slips": i. e. abstracts, made by her upon typewriters in her possession, or to which she had access, of records prepared by agents of the Federal Bureau of Investigation, for the most part those on file in the Internal Security Section. In most cases these related to the activities of persons in the United States, who were, or were suspected to be, acting on behalf of the Soviet Union, or one of its satellites. Finally, there was a statement typed by her saying that she had unsuccessfully tried to see the "top secret" report which, as we have said, Foley had refused to show her. All these documents, taken with the repeated instances in which she had shown an insistent wish to get access to such records, and with her meetings in New York, made out a case which must have satisfied any fair minded jury that she was engaged in the conspiracy with which she was charged; and that, when the right moment came, she meant to pass the packet to Gubitchev. Indeed, it does not appear why she had not already done so before her arrest, as the agents presumably supposed that she had.

Because the arrest in this way interrupted the consummation of the crime,

one point upon the appeal is that her conduct still remained in the zone of "preparation," and that the evidence did not prove an "attempt." This argument it will be most convenient to answer at the outset. A neat doctrine by which to test when a person, intending to commit a crime which he fails to carry out, has "attempted" to commit it, would be that he has done all that it is within his power to do, but has been prevented by intervention from outside; in short, that he has passed beyond any *locus poenitentiae*. Apparently that was the original notion, and may still be law in England; but it is certainly not now generally the law in the United States, for there are many decisions which hold that the accused has passed beyond "preparation," although he has been interrupted before he has taken the last of his intended steps. The decisions are too numerous to cite, and would not help much anyway, for there is, and obviously can be, no definite line; but Judge Cullen's discussion in People v. Sullivan,[1] and Mr. Justice Holmes' in two Massachusetts decisions,[2] are particularly enlightening. In the second of the Massachusetts opinions Holmes, J., said: "Preparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor, although there is still a locus poenitentiae, in the need of a further exertion of the will to complete the crime." We have found scarcely any decisions of federal courts, but, so far as they go, they are in accord.[3] There can be no doubt in the case at bar that "preparation" had become "attempt." The jury were free to find that the packet was to be delivered

that night, as soon as they both thought it safe to do so. To divide "attempt" from "preparation" by the very instant of consummation would be to revert to the old doctrine.

■ We find it necessary to discuss only one of the remaining supposed errors, before taking up the arrest and the "wire-tapping," and that is the inconsistency between the acquittal on Count 2 and the conviction on Count 4. The argument is that, if the acquittal would have been *res judicata*, had the trials been at different times, it was an adjudication when the verdicts were simultaneous. That is an error; when at the same trial a jury renders inconsistent verdicts of acquittal and conviction, the inconsistency is immaterial and the conviction will stand.[4] The Supreme Court in Dunn v. United States, supra, 284 U.S. at page 393, 52 S.Ct. at page 190, 76 L.Ed. 356, adopted what we said in Steckler v. United States, supra, 7 F.2d at page 60: "We interpret the acquittal as no more than their"—the jury's —"assumption of a power which they had no right to exercise, but to which they were disposed through lenity." And later, in Dotterweich v. United States, supra, 320 U.S. at page 279, 64 S.Ct. at page 135, 88 L.Ed. 48, the Court said: "Whether the jury's verdict was the result of carelessness or compromise * * * is immaterial. Juries may indulge in precisely such motives or vagaries."

■ Thus there remain for consideration only the three main questions which we mentioned at the outset, of which the first is whether the arrest on March 4th was valid. Upon its validity concededly depends the validity of the seizure of the incriminating packet and of its competence as evidence at the trial. In the absence

1. 173 N.Y. 122, 133–136, 65 N.E. 989, 63 L.R.A. 353.
2. Commonwealth v. Kennedy, 170 Mass. 18, 20, 22, 48 N.E. 770; Commonwealth v. Peaslee, 177 Mass. 267, 272, 59 N.E. 55, 56.
3. Wooldridge v. United States, 9 Cir., 237 F. 775; Gregg v. United States, 8 Cir., 113 F.2d 687; United States v. Duane, D.C., 66 F.Supp. 459, 464, 465.

4. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48; Steckler v. United States, 2 Cir., 7 F.2d 59, 60; Foshay v. United States, 8 Cir., 68 F.2d 205, 217; Stein v. United States, 9 Cir., 153 F.2d 737, 744; United States v. Hare, 7 Cir., 153 F.2d 816; Pilgreen v. United States, 8 Cir., 157 F.2d 427.

of some controlling federal law the validity of an arrest for a federal crime depends upon whether an arrest for a state crime would have been valid under the state law, if made in the same circumstances. Whatever the doubts which might have existed as to this before 1948,[5] they were laid in that year.[6] At common law a private person, as distinct from a peace officer, had the power to arrest without warrant for a felony, committed in his presence,[7] and for one, actually committed in the past, if he had reasonable ground to suppose that it had been committed by the person whom he arrested.[8] A "constable" or other "conservator of the peace" had all the powers of arrest without warrant of a private person, and in addition the power to arrest for felony, although no felony had actually been committed, if he had reasonable ground to suppose that the person arrested had committed the felony.[9] That was the only distinction between their powers and those of a private person. The law of New York [10] is nearly, if not quite, in accord with this. Until 1934 no federal law gave any power to agents of the Federal Bureau of Investigation to arrest either with or without warrant, although there had been on the books since 1795 [11] a statute giving to marshals and deputy marshals the powers of arrest without warrant possessed by state sheriffs and their deputies.[12] In 1934 Congress passed the law which is now § 3052 of the Criminal Code,[13] and which, when introduced in the House, granted power to agents of the Bureau as follows: "to make arrests without warrant for felonies cognizable under the laws of the United States, in cases where the person making the arrest has reasonable grounds to believe that the person so arrested is guilty of such felony." This bill was referred to the Judiciary Committee, which reported it out favorably, but with the addition of the words: "and where there is a likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be immediately taken before a committing officer." In this form it passed the House without comment, but in the Senate it was still further amended by the addition after the word, "felonies," of the phrase, "which have been committed"; and in that form it passed and remained until the recension of Title 18 which became effective in 1948 and which struck out the phrase added in the Senate.

Since the agents of the Bureau are private persons it would seem under United States v. Di Re, supra,[14] that in 1934 they already had the same powers of arrest as private persons in any state where they acted. It is possible therefore to argue that the Act of 1934 should be read as cumulative: i. e. as giving the agents added powers of arrest. However, the history of the Act shows that this cannot have been its purpose, and indeed the Department does not say that it was. When introduced, the House bill extended the powers beyond those possessed by private persons by granting agents the same power that a "peace officer" had at common-law. So far it might have been meant to be only cumulative. At once the Judiciary Committee added the limitation that the person arrested must be likely to escape, which transferred the bill into a grant of powers theretofore unknown to the law: in some respects greater than those of a private person, in some respects less. The Senate then imposed the limitation that a felony must actually have been committed, thus narrowing the grant, because of the "escape" condition, to even

5. Marsh v. United States, 2 Cir., 29 F.2d 172.

6. United States v. Di Re, 332 U.S. 581, 589, 590, 68 S.Ct. 222, 92 L.Ed. 210; Johnson v. United States, 333 U.S. 10, 15, Note 5, 68 S.Ct. 367, 92 L.Ed. 436.

7. § 165, Vol. 1, Bishop's New Criminal Procedure.

8. § 168, Vol. 1, Bishop's New Criminal Procedure.

9. § 181(2), Vol. 1, Bishop's New Criminal Procedure.

10. §§ 177 and 183, Code of Criminal Procedure.

11. 1 St.L., p. 425, 28 U.S.C.A. § 549.

12. § 3053, Title 18 U.S.C.A.

13. § 3052, Title 18 U.S.C.A.

14. 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210.

less than the power possessed by private persons at common-law. There can therefore be no doubt that the Act of 1934 was intended to be a constitutive, not a cumulative, grant of any powers of arrest without warrant which the agents were to have. And this conclusion is confirmed, if confirmation be necessary, by the fact, that, although in 1948 the grant was restored to the form in which the House had passed it in 1934, by cancelling the condition that a felony must have been committed, the condition was still retained that the person arrested must be likely to escape. For reasons which we do not know it is therefore apparent that Congress has always been grudging in its grant of this power to the Bureau, and we should not be justified in construing the limitation with an inauspicious eye.

 Although the judge found that the agent who made the arrest had reason to believe that Judith Coplon was likely to escape, we can see no basis for the finding. How much the agent knew of what the Bureau itself knew does not appear; but, although we may impute to him all that we now know, we may not impute more, for we are bound by the record. The Bureau knew that she had twice been in contact with a Russian, who it was fair to suppose was an emissary of the Soviet Union of one kind or another. Their meetings had given every appearance of furtiveness and fear of apprehension. She had manifested a persistent interest in secret reports of the Bureau regarding Russia which was somewhat sinister in one of her position. On March 4th she was apparently prolonging her third meeting with Gubitchev quite unnecessarily, unless it were to find a moment for some critical action; and she was acting with redoubled caution and apprehension.

This situation appears to us to have given ample reason to suppose that these meetings were in pursuance of a concerted venture whose object was the delivery of information prejudicial to the national security: in short, that a criminal conspiracy was in progress before the eyes of the agents. On the other hand we can see nothing to justify the assumption that the meanderings of March 4th were to be the last contacts between the two. They had shown at the first two meetings that they feared they were being shadowed; yet that had not been enough to induce either one to abscond. If this third meeting went off as well as the others, and if it resulted—as the agents supposed it would and indeed that it had—in the delivery of useful information, the more reasonable inference was that it would be followed by the delivery of other papers. It was absolutely essential to the continuance of any such commerce that Judith Coplon should keep her position, through which alone she had access to the necessary papers. Escape would have put a final end to the enterprise and would incidentally have been the most serious confession of guilt which she could make. All this seems to us to have pointed almost with certainty to the conclusion that, if they separated on March 4th without interruption, she would go back to Washington and hold her job.

Moreover, there was not the slightest need of arresting her without a warrant, even if there had been danger that she might run away and hide. It is apparent that even in the morning the Bureau had decided to arrest her that day; and there was not the least need of doing so without a warrant. No sudden emergency forced the hand of the agents; they made everything ready except the one condition which would have made the arrest lawful: a warrant. Foley had delivered to her the decoy letter that morning; an assistant to the Attorney General followed her to New York; the number of agents assigned to trail her had risen from seven to twenty-four; a matron had been detailed at the court-house to take charge of her after her arrest. Nor was there danger that she might learn that warrant had been got; it could have been procured *ex parte*. The statute certainly requires a warrant when there is time to obtain one; the dispensation is limited to occasions when it is not safe to wait. The only excuse that is suggested is that Gubitchev might

have made off with the papers, and to it there are two answers. First, the condition is not that evidence shall be likely to escape, but that the person to be arrested shall be. Second, if a warrant had been obtained, the incriminating papers could as well have been seized. We have no alternative but to hold that the arrest was invalid, and concededly that made the packet incompetent against her.

The next question is of the "taps" taken after January 6th. It is of course well-settled law that "wiretapping" is forbidden by statute;[15] and that evidence obtained by a federal officer in violation of law may not be used against the victim of the violation.[16] In United States v. Goldstein [17] we declared what, as we understood the law, was the consequence of "wiretapping." The accused has the burden of proving that the prosecution has in fact "tapped" his wires; but, if he succeeds in doing so, the burden falls upon the prosecution to prove that the information so gained has not "led," directly or indirectly, to the discovery of any of the evidence which it introduces. It is true that on appeal [18] although the Supreme Court affirmed our decision, it was careful not to affirm this ruling, and, as we said in our opinion, it was not an inevitable gloss upon what the court had said in Nardone v. United States.[19] However, we thought then, and we still think, that it best carries out the purpose of the language used, and we shall adhere to it, until we are told that it is wrong. The question in the case at bar is therefore whether the prosecution succeeded in proving that the "taps" taken between January 6th and March 4th were not necessary to the production of any of the evidence introduced at the trial.

All the "taps" were made at the personal direction of the Attorney General, and they may be divided into three groups:

those of Judith Coplon's home telephone in Washington, which began on January 6th; those of her office telephone in Washington, which began on January 25th; and those of her Brooklyn telephone, which began on February 1st. All of these continued without interruption until March 12, 1949; and some continued later. On February 1st the agents also began to "tap" Gubitchev's New York telephone; but it does not appear that these "taps" included any talks between him and her; and, if she was not a party,[20] any evidence so obtained was competent against her.[21] The Washington "taps" were recorded by "monitors" in constant attendance, who were provided with automatic recording discs, which they put in operation whenever they thought best, and who also made handwritten notes or "logs." From these and the discs the "monitors" prepared typed "logs," all of which were preserved and were produced at the trial. For use at the trial new discs—called "dubs"—were made from the originals, from which those passages were expurgated, which either related to "taps" of other telephones, or whose disclosure the prosecution thought might be dangerous to "national security." The typed "logs" were "photostated," and from the copies so made those passages were blotted which were thought possibly inimical to "national safety." Judith Coplon was allowed to examine all the recordings by disc or "log" of the "taps" taken at her home, and many of those taken at her office; and nothing in any of these could have constituted "leads" to any of the evidence introduced at the trial. The judge examined the original discs and "logs" of those recordings at her office which he refused to let her see, and in his opinion these also could not have been "leads." He refused to let her see these, because he agreed with the prosecution that their disclosure might

15. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.
16. Silverthorne Lumber Co., Inc. v. U. S., 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.
17. 2 Cir., 120 F.2d 485, 488.
18. Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312.

19. 308 U.S. 338, 341, 60 S.Ct. 266, 84 L. Ed. 307.
20. United States v. Polakoff, 2 Cir., 112 F.2d 888, 134 A.L.R. 607.
21. Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312.

be dangerous to "national security." The New York "taps" were recorded a little differently. These "monitors" had automatic recording instruments also which they used to record what they thought worth preserving; and they made handwritten "logs," and other records, called "resumés," whose character is left a little uncertain. From all these originals weekly "letters" were prepared and sent to Washington, designed to comprise their contents; these have been preserved and were produced at the trial. The judge submitted most of the "letters" to the defence, and (as in the case of the Washington records) they showed nothing which could have "led" to any of the evidence introduced. He also personally examined those "letters" which he refused to let the defence see, and found them irrelevant—his refusal being for the same reason as in the case of the Washington records.

█ The original records of the New York "taps": i. e. the discs, the notes or "logs" and the "resumés," were destroyed. The prosecution excuses this on the ground that it was the practice of the New York office to destroy all original records at the end of thirty to sixty days, unless there was some especial reason for preserving them; and the judge found that such a practice had existed. The undisputed testimony was that there remained on November 10th no original records of "taps" made before July 12th, which was to be expected from the practice. There did remain about ten discs and an undetermined number of original writings, which an agent, Avignone, destroyed at the direction of his superior in Washington, who ordered him to do so "in view of the imminency of her trial": i. e. Judith Coplon's. Because of this she asks us, in accord with the canon contra spoliatorem, to infer that the discs and papers so destroyed contained "leads" to some of the evidence introduced. It appears to us that no such inference would be justified. In the first place there is every reason to suppose that the "letters" must have been intended completely to inform the Washington office and that they

were therefore adequate summaries of the originals; it would be absurd to think that the New York office meant to conceal any of the facts from the Washington office. Furthermore, none of the records destroyed on November 10th could have been relevant, because they must all have been of "taps" taken after July 12th, and long before that date all the evidence introduced at the trial had been obtained. Again, so far as the destruction was in accord with the usual practice of the office, it could scarcely have been with a sinister purpose, for the "letters" remained, equally available as the originals. Finally, there was an adequate motive for the destruction in the natural desire of every office to rid itself of useless litter the substance of which has been preserved. Thus despite the undoubted blunder of destroying such records post litem motam, we agree with the judge that there was no reason to infer that they would show anything different from the "letters."

█ The only relevant inquiry comes down to this: was it an error for the judge not to let the defence see those records which he read in camera and on which he in part based his finding that the "taps" had not "led" to any evidence introduced at the trial? We cannot see how this action can be sustained; or any escape from the following reasoning. Since the prosecution had the burden of showing that the "taps" did not "lead" to any of the evidence, it could not carry that burden without showing that none of the "taps" did so, and the suppressed documents were concededly records of some of the "taps." As records they were competent only because they were a substitute for the testimony of the "monitors," who actually heard the intercepted talk and took it down in one form or another. If the prosecution had not had the records and had been obliged to rely upon the testimony of the "monitors," it would certainly have been constitutionally necessary under the Sixth Amendment to examine them openly and in court; even their depositions could not have been

used,[22] to say nothing of examining them *in camera*. Unless therefore there is some excuse which will toll this constitutional privilege it appears irrefragably demonstrable that the suppressed records were incompetent.

There certainly is no such excuse. We agree that there may be evidence—"state secrets"—to divulge which will imperil "national security"; and which the Government cannot, and should not, be required to divulge.[23] *Salus rei publicae suprema lex*. The immunity from disclosure of the names or statements of informers is an instance of the same doctrine.[24] This privilege will often impose a grievous hardship, for it may deprive parties to civil actions, or even to criminal prosecutions of power to assert their rights or to defend themselves. That is a consequence of any evidentiary privilege. It is, however, one thing to allow the privileged person to suppress the evidence, and, *toto coelo*, another thing to allow him to fill a gap in his own evidence by recourse to what he suppresses. In United States v. Andolschek[25] we held that, when the Government chose to prosecute an individual for crime, it was not free to deny him the right to meet the case made against him by introducing relevant documents, otherwise privileged. We said that the prosecution must decide whether the public prejudice of allowing the crime to go unpunished was greater than the disclosure of such "state secrets" as might be relevant to the defence. To that we adhere. It is true that the situation at bar is not the same, because the privileged documents were in fact introduced in evidence; and, since we have not seen them and do not mean to look at them, we will assume that they justified the judge's finding that they did not "lead" to any evidence introduced.

However, the refusal to allow the defence to see them was, as we have said, a denial of their constitutional right, and we can see no significant distinction between introducing evidence against an accused which he is not allowed to see, and denying him the right to put in evidence on his own behalf. In the case at bar it may seem to have been a flimsy grievance to deny to Judith Coplon the opportunity to argue that these records did "lead," or might have "led," to her conviction; in truth it is extremely unlikely that she suffered the slightest handicap from the judge's refusal. But we cannot dispense with constitutional privileges because in a specific instance they may not in fact serve to protect any valid interest of their possessor. Back of this particular privilege lies a long chapter in the history of Anglo-American institutions. Few weapons in the arsenal of freedom are more useful than the power to compel a government to disclose the evidence on which it seeks to forfeit the liberty of its citizens. All governments, democracies as well as autocracies, believe that those they seek to punish are guilty; the impediment of constitutional barriers are galling to all governments when they prevent the consummation of that just purpose. But those barriers were devised and are precious because they prevent that purpose and its pursuit from passing unchallenged by the accused, and unpurged by the alembic of public scrutiny and public criticism. A society which has come to wince at such exposure of the methods by which it seeks to impose its will upon its members, has already lost the feel of freedom and is on the path towards absolutism.

Those decisions on which the prosecution and the judge relied do not touch the point at bar. They held that the state-

22. Fed.Rules Crim.Proc. rule 15, 18 U.S.C.A.
23. Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846; Ex parte Sackett, 9 Cir., 74 F.2d 922; United States v. Andolschek, 2 Cir., 142 F.2d 503, 506; Bank Line v. United States, 2 Cir., 163 F.2d 133, 138; Stegall v. Thurman, D.C., 175 F. 813.
24. Vogel v. Gruaz, 110 U.S. 311, 316, 4 S.Ct. 12, 28 L.Ed. 158; In re Quarles & Butler, 158 U.S. 532, 536, 15 S.Ct. 959, 39 L.Ed. 1080; Segurola v. United States, 1 Cir., 16 F.2d 563, 565; Wilson v. United States, 3 Cir., 59 F.2d 390, 392.
25. 2 Cir., 142 F.2d 503, 506.

ments of witnesses taken by one party in preparation for trial need not be disclosed to the opposite party, unless the judge holds on inspection that their contents is relevant.[26] The party who has prepared such statements has an obvious interest in preventing the other party from inspecting them yet the other party has an interest in introducing them, if they are relevant. There is no way in which this conflict can be resolved except by making the judge's private inspection final, subject to review and while it is true that this deprives the party who is denied inspection of any opportunity to dispute the judge's conclusion, that is unavoidable. So far as the situation can be provided for in general terms, which it cannot be, the Rules now do so.[27] Moreover, at best these decisions go no further than to deny to one party the possible advantage of evidence in the possession of his adversary; they do not countenance the introduction by one party of evidence in support of his position which the other party is forbidden to see.

There remains only the question whether the defence was also unduly prevented from learning whether the information which originally "led" to "tapping" Judith Coplon's telephones, to tracking her movements, and finally to detecting the crime, was itself the result of "wiretapping." The prosecution conceded that the Bureau had been set upon the trail by what it described as a "confidential informant"; and the testimony showed that that was a frequent euphemism for a "wiretapper," although the prosecution denied that in this instance that was true. Nevertheless, it was not a foregone conclusion that the "informant" could not have been a "wiretapper," or that, if he was, he had not intercepted any talks to which Judith Coplon had been a party. Nevertheless the judge refused to allow the defence to press the examination of agents upon the stand as to who the "informant" was,

and that too in the face of very equivocal answers even to the questions which were allowed. The point came up most acutely in the examination of Fletcher, the inspector in general charge of the investigation. The defence was trying to learn whether the "informant" was a "wiretapper," and, although the issue was a good deal clouded by colloquy, it is reasonably clear that the judge meant to rule that he would not allow the inquiry at all. The prosecution had delivered to him a large batch of records, consisting we are told of 5000 pages, which covered all the information in the Bureau's possession about either of the accused. These papers the judge perused and he gave as his reason for refusing to allow the inquiry to proceed that they showed "that information was obtained by the Federal Bureau of Investigation concerning the defendant Coplon prior to January, 1949, from sources other than "wiretapping." To this he later added that he would "state for the record that the statement that there was a confidential informant will not enter in any way in determining the issues in this hearing"; he did not feel that the matter "was relevant to this hearing," and that it was one "affecting the national security."

It is always in a judge's discretion, as indeed it is his duty, to stop an examination when he can see that its further progress will be futile; it is especially important to do so in a long case like this. But up to the time when the judge stopped this examination nothing had appeared to justify doing so; on the contrary the testimony so far elicited suggested that the "confidential informant," who had touched off the investigation, might well have been a "wiretapper"; and, if he had been, Judith Coplon was entitled to learn whether she had been a party to any of the intercepted talks. Thus, the judge did not stop the inquiry because he could see from what had already developed that it was bound to be

---

26. United States v. Krulewitch, 2 Cir., 145 F.2d 76, 156 A.L.R. 337; United States v. Ebeling, 2 Cir., 146 F.2d 254; United States v. Simonds, 2 Cir., 148 F.2d 177; United States v. De Normand, 2 Cir., 149 F.2d 622, 625; United States v. Beekman, 2 Cir., 155 F.2d 580, 584.

27. June v. George C. Petersen Co., 7 Cir., 155 F.2d 963, 967.

unprofitable; he gave no such reason and could not have done so. He stopped it because he was convinced as to what the fact was by evidence which he refused to let her see. But obviously it is as much a use of suppressed evidence to base upon it a finding that further examination will be idle, as it is to base upon it a finding that intercepted talks have not "led" to evidence introduced at the trial. We need not hold and we do not now decide whether in trying to prove that his telephone talks have been unlawfully intercepted, an ac-. cused may never be blocked by the fact that his questions call for answers whose disclosure will be a danger to "national security"; and, as we have just said, it may appear from what has already been the testimony that the examination ought not to be prolonged. But there was as yet nothing to indicate that it would disclose any "state secrets" to learn whether the "informant" was a "wiretapper," and whether Judith Coplon had been a party to any of the intercepted talks; and if that had once appeared, the burden would have shifted and the prosecution would have been obliged to introduce the records. The judge ended all chance of asserting the privilege by deciding the issue on the evidence contained in the files. For all the foregoing reasons the conviction must be reversed; but we will not dismiss the indictment, for the guilt is plain, and it is possible on another trial that there may be more evidence of the likelihood of an escape; that the prosecution may decide to divulge the contents of the "taps"; and that the examination as to the "confidential informant" may go far enough to show that he was not a "wiretapper."

The doctrine that the prosecution may not introduce against an accused evidence which it has obtained by its own violation of law or that of another official of the same government, was unknown to the common law and is not yet universally accepted outside federal courts. The reason which has brought about its acceptance is that there is no other way by which the accused can secure that protection which the law professes to accord him. By hypothesis the evidence should not be introduced, and would not have been found, if officials had not violated the laws designed to deny them access to it. In cases, such as that at bar, where the head of the same department of a government which has charge of the prosecution has directed the unlawful acquisition of the information, it is pretty obvious that this is the only tolerable result. True, the doctrine also applies to the acts of any official of the same government; and it follows, as the opponents argue, that the mistake of an underling may result in what is in effect an amnesty. That does presuppose that in the prosecution of crime a government is so far a unit that it will be charged with the conduct of any official or any agent, of the fruits of whose wrong it chooses to avail itself; and perhaps the doctrine should be modified. Perhaps, also, the powers of the Bureau to arrest without warrant should be broadened; and perhaps it would be desirable to set limits —as, for example, in cases of espionage, sabotage, kidnapping, extortion and in general investigations involving national security and defence—to the immunity from "wiretapping" of those who are shown by independent evidence to be probably engaged in crime. All these are matters with which we have no power to deal, and on which we express no opinion; we take the law as we find it; under it the conviction cannot stand.

Conviction reversed; cause remanded.