**UNITED STATES**

v.

**Charles E. SCHOOF, 530 92 8718, Operations Specialist Third Class (E–4), U.S. Navy.**

**NMCM 90 3831.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 25 April 1990.

Decided 30 Jan. 1992.

Capt Dwight H. Sullivan, USMC, Appellate Defense Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

Before MITCHELL,* FREYER and HOLDER, JJ.

PER CURIAM: [1]

In early October of 1989, the appellant was experiencing financial difficulties as a result of his drinking, cocaine use, absence without leave, and involvement with civilian authorities. He approached Operations Specialist Third Class (OS3) John J. Haeger on his ship, the USS FAIRFAX COUNTY (LST 1193), located in Norfolk, Virginia, and suggested that they might make money by selling classified material to the Soviets. OS3 Haeger was the ship's Naval Warfare Publications Custodian and had access to the Naval Warfare Publications Library safe in the Combat Information Center (CIC), where various classified material was stowed. The appellant and OS3 Haeger entered CIC, and OS3 Haeger opened the safe. The appellant claims that he asked Haeger for microfiches that would be the least damaging to the United States but of sufficient value to the Soviets to get the appellant out of debt. Haeger took and gave to the appellant twelve microfiches still classified SECRET. They endeavored to take only such material as had been superseded. The appellant put the microfiches into his locker on board ship.

Later that month, the appellant attended a counter-intelligence briefing, where he listened to a Naval Investigative Service (NIS) agent describe how John Walker, the infamous U.S. Navy officer now serving a life sentence for espionage, had walked into the Soviet Embassy. Instead of heeding the counter-intelligence briefing as an admonition, the appellant treated it as instruction on modus operandi and decided that he could sell the classified material he had in the same way. He telephoned the Soviet Embassy in Washington, D.C., at least three times. The first time he was asked to bring the material to the embassy; when he countered that the embassy should send someone to pick it up from him, the person at the embassy said no and hung up. He called back and argued with the person at the embassy about having someone pick up the material from him in Norfolk but got nowhere. Another time he called to find out the hours that the embassy was open for business. Sometimes there was no answer.

In mid-November 1989, the appellant borrowed a motorcycle and began driving toward Washington with the intent to deliver the classified material to the Soviet Embassy. Upon reaching a point between Williamsburg and Richmond, he changed his mind, decided that he could not go through with it, and returned to Norfolk. Upon his return, he stopped at a bar and was drinking heavily when he encountered a friend who was on terminal leave. He explained, in sufficient detail for his friend to surmise what he was up to, how he planned to make some money and solicited his friend to drive him up to Washington. After stalling for a few days, the friend ultimately refused. A short time later, the microfiches in the possession of the appellant were discovered missing from the ship's safe, and a search for them was ordered. The appellant was apprehended on 1 December 1989 while leaving the ship. When it was clear that he would be searched, he surrendered the microfiches to a Naval Investigative Service agent.

On the above facts, the appellant was charged with conspiracy with OS3 Haeger to commit espionage, espionage by attempting to deliver the microfiches to a foreign power, larceny of the microfiches, solicitation of the friend on terminal leave to aid and abet espionage, and three violations of 18 U.S.C. § 793. He was also charged with using cocaine on and off his ship. He pled

---

*Senior Judge MITCHELL took final action on this case prior to his retirement.

1. Oral argument in this case was heard at the Naval Legal Service Office, Norfolk, Virginia.

guilty, with minor exceptions, to the drug charges and the conspiracy charge, guilty as charged to the attempted espionage and solicitation charges, and not guilty to the rest. He was found in accordance with his pleas. In compliance with a pretrial agreement, the Government did not contest the charges or other matters to which the appellant pleaded not guilty. The court-martial, composed of officer members, sentenced the appellant to a dishonorable discharge, forfeiture of all pay and allowances, reduction to pay grade E–1, and confinement for 25 years. The convening authority approved the sentence but suspended confinement over 20 years for 12 months from the date of sentencing in compliance with the pretrial agreement.

Appellate defense counsel has raised six assignments of error[2]. In light of the disposition of the appeal herein, only Assignments I and II need be addressed. These assignments are closely related, because the latter asserts that the appellant did not so nearly approximate the completed offense as to have committed an attempt, while the former asserts that, even if he did, the inquiry raises, but does not settle, the affirmative defense of voluntary abandonment.

At common law, there was no attempt unless the defendant had committed an overt act which "must be the final one towards the completion of the offense, and of such character that, unless it had been interrupted, the offense itself would have been committed." *People v. Sullivan,* 173 N.Y. 122, 65 N.E. 989, 992 (1903). *See also United States v. Coplon,* 185 F.2d 629 (2d Cir.1950), *cert. denied,* 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952). There was, therefore, little or no need for the affirmative defense of voluntary abandonment, since virtually any *locus poenitentiae* would necessarily be excluded by the very elements of attempt.

■ The rule in this country seems to be based less upon concerns with the proximity to completion of the crime than on the dangers posed by people abroad in society seriously intent upon committing specific crimes. Under this theory, the inquiry is focused upon the firmness of the defendant's resolve to commit the crime; an overt act is still required, but proximity of the overt act to the completed crime is just one indicium of the firmness of the defendant's resolve, not necessarily the only one that the law will entertain. Consequently, the rule is now phrased as requiring conduct by the defendant which goes beyond mere preparation and constitutes a substantial step toward commission of the crime, a substantial step being one which is strongly corroborative of the defendant's criminal intent. *United States v. Byrd,* 24 M.J. 286, 290 (C.M.A.1987) (opinion of Chief Judge Everett).

■ Even though, under current law, the principal function of overt acts is said to be to demonstrate the seriousness of the ac-

---

2. I. THE MILITARY JUDGE ERRED BY ACCEPTING APPELLANT'S PLEA OF GUILTY WHERE THE PROVIDENCE INQUIRY INDICATED THAT APPELLANT HAD A POTENTIAL VOLUNTARY ABANDONMENT DEFENSE TO THE CHARGED ATTEMPTED ESPIONAGE.
II. THE MILITARY JUDGE ERRED BY ACCEPTING APPELLANT'S PLEA OF GUILTY TO ATTEMPTED ESPIONAGE WHERE THE PROVIDENCE INQUIRY FAILED TO REVEAL AN OVERT ACT WHICH MOVED BEYOND MERE PREPARATION TO COMMIT ESPIONAGE.
III. THE MILITARY JUDGE ERRED BY DENYING A CHALLENGE FOR CAUSE AGAINST A MEMBER WHO WAS RESPONSIBLE FOR PREVENTING LOSS OR THEFT OF CLASSIFIED MATERIAL FROM HIS SHIP WHERE THE ACCUSED HAD PLED GUILTY TO CONSPIRING TO COMMIT ESPIONAGE BY SELLING CLASSIFIED MICROFICHE TAKEN FROM ABOARD A U.S. NAVY VESSEL.
IV. A SENTENCE WHICH INCLUDES CONFINEMENT FOR 20 YEARS IS INAPPROPRIATELY SEVERE IN LIGHT OF THE SENTENCES ADJUDGED FOR OTHER SIMILAR OFFENSES.
V. THE CONVENING AUTHORITY ERRED BY FAILING TO INDICATE IN HIS ACTION THAT A COMPANION CASE HAD BEEN TRIED SEPARATELY.
VI. THE STAFF JUDGE ADVOCATE ERRED BY INFORMING THE CONVENING AUTHORITY THAT APPELLANT HAD BEEN CONVICTED OF ESPIONAGE WHEN, IN FACT, HE WAS CONVICTED OF ATTEMPTED ESPIONAGE.

cused's intent, the U.S. Court of Military Appeals has made clear in *United States v. Byrd, United States v. Presto*, 24 M.J. 350 (C.M.A.1987), and *United States v. Church*, 32 M.J. 70 (C.M.A.1991), that the distinction between mere preparation and substantial steps, however difficult it may be to discern, and the insufficiency of mere preparation for a finding of attempt remain viable legal principles in the substantive law of attempts. It would, therefore, be entirely too facile to argue that guilty pleas, insofar as they may be construed as, in effect, admitting the seriousness of the accused's intent, thereby dispense with any requirement for the record to show acts amounting to more than mere preparation. At most, it appears that guilty pleas may serve to elucidate intent in borderline cases—cases that are, on their facts, already in the "twilight zone" of substantial steps. Since *United States v. Byrd* and *United States v. Presto* are guilty plea cases, and both participating judges expressed the view that the respective providence inquiries did not demonstrate facts going beyond mere preparation, the law is clear that even guilty pleas, although ostensibly admitting the seriousness of the accused's intent, neither supplant nor eliminate the substantive legal requirement of substantial steps amounting to more than mere preparation.

■ In *United States v. Church*, Judge Cox cites several of the tests formulated to distinguish substantial steps from mere preparation. 32 M.J. at 71. Courts have also looked to the defendant's investment of time, money, and risk in the undertaking to ascertain his seriousness of purpose. Thus, although the overt act need not be criminal in itself, it is noteworthy if it is, for the defendant's self-exposure to criminal liability may be indicative of his intent to carry the matter through to completion. Where money has changed hands as the consideration for the illegal transaction, that has been cited as a material factor. *See United States v. Johnson*, 767 F.2d 673 (10th Cir.1985), wherein the court, in distinguishing *United States v. Joyce*, 693 F.2d 838 (8th Cir.1982), states: "The required substantial step towards commission of the crime was lacking when the defendant refused to produce any money for the purchase of the drug ..." 767 F.2d at 675. *See also United States v. Pennyman*, 889 F.2d 104 (6th Cir.1989). According to *United States v. Byrd*, however, even the exchange of money may not be sufficient. *Cf., United States v. Mandujano*, 499 F.2d 370 (5th Cir.1974). Being the central player in detailed negotiations and making firm logistical arrangements predicated on success of the criminal enterprise have proved significant in some cases, at least in the expansive view of the First Circuit. *See United States v. Dworken*, 855 F.2d 12 (1st Cir.1988), disapproving both *United States v. Joyce* and *United States v. Delvecchio*, 816 F.2d 859 (2d Cir.1987). The magnitude of the danger engendered by the attempt is occasionally cited.

■ The more remote that conduct may be and still be characterized as a "substantial step," the more essential it is to recognize an affirmative defense of voluntary abandonment. Whether it is desirable to do so in cases of such extreme proximity as *United States v. Walther*, 30 M.J. 829 (N.M.C.M.R.1990), is less obvious. In *United States v. Byrd*, Chief Judge Everett writes: "In various Federal cases the doctrine of voluntary abandonment seems to have been recognized either expressly or by implication." 24 M.J. at 291 (footnote omitted). Those words are well-chosen, for, in many of the cases cited for the proposition, it is difficult to distinguish between whether the courts are recognizing voluntary abandonment as an affirmative defense to attempt or are merely treating the opportunity for abandonment, as evidenced by the actual abandonment, as an indication that events had not gone beyond mere preparation. *See United States v. Joyce* and *United States v. Delvecchio*.

In some cases, such as *United States v. Byrd*, in which both participating judges opined that Byrd's actions had not gone beyond mere preparation, the distinction will be immaterial, for, in either situation, the result will be the same, and the defendant will be exonerated. In cases where an attempt has already been committed, how-

ever, the distinction is material, indeed. This is so because the affirmative defense of voluntary abandonment comes with numerous conditions attached, as shown by § 5.01(4) of the ALI Model Penal Code (1962), quoted in *Byrd*, 24 M.J. at 286. As stated therein:

> Within the meaning of this Article, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, that increase the probability of detection or apprehension or that make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim.

If the courts, instead of applying voluntary abandonment as an affirmative defense, use the fact of abandonment to negate the element of more than mere preparation, the motive for the abandonment loses much of its significance. Usually, the abandonment in such cases comes about from the defendant's failure to appear for a transaction which he senses is a set-up (*Delvecchio*), or imposition of conditions either at the moment of the crime to back out of a transaction which he senses is a set-up (*Joyce*), or earlier on so as to make a set-up more difficult (*Dworken*). Although none of these situations meets the criteria for the affirmative defense of voluntary abandonment, the first two served to negate convictions for attempt in *Delvecchio* and *Joyce*, respectively, while the third failed to do so in *Dworken*.

■ The providence inquiry in this case never explicitly established the reason for the appellant's change of mind which caused him to return to Norfolk, but, when the inquiry progressed to the solicitation charge, it satisfactorily excluded any affirmative defense of voluntary abandonment. No sooner did the appellant return to Norfolk than he began seeking an alternative mode of transportation to Washington. That sequence of events allows for

the inference that his change of mind was due to some dissatisfaction with the motorcycle as a mode of transportation, rather than with the underlying treacherous design. While there may be some theoretical possibility that the appellant could have "permanently" abandoned, and then later revived, his original criminal purpose, the providence inquiry need not eliminate every such theoretical possibility. The record adequately demonstrates that the appellant had not permanently renounced his criminal purpose and, therefore, could not avail himself of the affirmative defense of voluntary abandonment.

■ The real issue in this case is whether or not there was an attempt at all. The providence inquiry shows that the appellant made vague, preliminary unreported contacts from Norfolk by telephone with the Soviet Embassy in Washington, conspired with OS3 Haeger to obtain the classified material in question and did obtain it, borrowed a motorcycle, and headed off in the direction of Washington, where the Soviet Embassy is located, to an uncertain reception. He had no appointment with anyone in the embassy; in fact, no one in the embassy was even aware that he was coming. The Soviets had no idea who he was or what he had, and no terms of payment or delivery had even been mentioned, much less agreed upon. In this regard, it should be remembered that the appellant's ultimate objective was not to commit espionage for political reasons but to obtain money, and that the delivery of classified material was intended solely as a means to that end. Thus, it may be inferred that any intent to deliver the material to the Soviets was probably only conditional upon reaching a satisfactory agreement with the Soviets on price and terms of payment. Unlike the situation in *United States v. Mandujano* as between that accused and his supplier, there had been no previous dealings between the appellant and the Soviets from which to extrapolate anything about his probable subsequent actions or the Soviets' likely response. At the time he turned back, more than a hundred miles of *locus poenitentiae* lay between him and

the Soviet Embassy. Had the appellant ever reached Washington, he would still have been confronted with the daunting choice of whether or not to take the fateful step of entering the curtilage of the Soviet Embassy, not to mention the embassy building, itself—steps not dependent upon external circumstances but requiring the further exercise of the appellant's will. The charge is that he did "attempt to deliver microfiche ... to a foreign government[.]" As a matter of law, no reasonable trier of fact could have found the appellant guilty of an attempt to deliver on such evidence. *Cf., United States v. Coplon.* Even though the appellant pled guilty, a conviction of espionage by attempting to deliver microfiche may not be affirmed on such a record.

Assignment II has merit. The appellant's pleas of guilty to Charge II and its Specification are vacated, and the findings of guilty based thereon are set aside. Since it is not known with certainty what evidence the Government might have been able to present had the appellant pleaded not guilty, it would be premature to dismiss Charge II and its Specification at this time. Accordingly, a rehearing on Charge II and its specification may be ordered. Assignment I is thereby rendered moot, and Assignments III through VI pertain only to the sentence. Accordingly, the remaining findings of guilty are affirmed.

The sentence is set aside. If a rehearing is ordered on Charge II and its Specification, a rehearing on the sentence, based on the affirmed findings of guilty and any additional findings of guilty entered at the rehearing, will, likewise, be ordered. If the convening authority elects to dismiss Charge II and its Specification, he may order a rehearing on the sentence or may reassess the sentence in accordance with the principles explained in *United States v. Sales,* 22 M.J. 305 (C.M.A.1986). At the conclusion of the further proceedings indicated in this paragraph, the record will be returned, via the Judge Advocate General, to this Court for completion of appellate review. Assignments III through VI are, therefore, moot.

FREYER, Senior Judge (concurring):

I concur in all respects in the *per curiam* opinion. As Chief Justice Holmes remarked in the leading case of *Commonwealth v. Peaslee,* 177 Mass. 267, 59 N.E. 55 (1901):

> If the accused intended to rely upon his own hands to the end, he must be shown to have had a present intent to accomplish the crime without much delay, *and to have had this intent at a time and place where he was able to carry it out.* We are not aware of any carefully considered case that has gone further than this.

59 N.E. at 57 (emphasis supplied). Since the appellant's delivery of classified material to the Soviet Embassy in Washington was intended to be committed by the appellant with his own hands, and he never even came close to the place where he would have been able to carry it out, he cannot be guilty of this attempt. Had Judith Coplon left the northbound train in Baltimore and returned to Washington without ever proceeding to New York and meeting her contact there, surely there would be no leading attempt case of *United States v. Coplon,* 185 F.2d 629 (2d Cir.1950), *cert. denied,* 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952). Likewise, had James P. Sullivan and his associates returned to Albany before ever nearing the village of Cobleskill, just as surely there would be no leading attempt case of *People v. Sullivan,* 173 N.Y. 122, 65 N.E. 989 (1903). Although espousing the more liberal American rule for defining attempts, the opinion in *People v. Sullivan,* nevertheless, takes great pains to mark the outer limits of physical proximity beyond which any activity can constitute no more than mere preparation for a criminal act requiring the physical presence of the perpetrator at the scene of the crime.

I write separately, however, both to reflect consideration of a theory under which the appellant might possibly have been found guilty of the charged attempt and, at the same time, to explain why I cannot vote to affirm under that theory on this record.

In *United States v. Church*, 32 M.J. 70 (C.M.A.1991), the accused was convicted of an attempt to murder his wife on the basis of his actions in soliciting a "hit man," providing him with money and various means to facilitate the crime, approving the methods proposed by the "hit man," expressing a preference for certain details regarding the manner of commission, and giving the "hit man" the final "go-ahead." The "hit man" turned out to be an agent of the Air Force Office of Special Investigations, with predictable consequences for the accused.

*Church* appears to represent a special class of cases in which an accused employs an agent, actual or supposed, to perpetrate a crime. *See also United States v. Martinez*, 775 F.2d 31 (2d Cir.1985), and the citation to *People v. Bush*, 4 Hill 133, in *People v. Sullivan*, 65 N.E. at 992. In *Church*, the accused's liability for attempt was not vicariously dependent upon the liability of the supposed agent, nor could it have been, since the supposed agent was a law enforcement officer who obviously did not share Church's criminal purpose; indeed, as acknowledged by the court, none of the supposed agent's acts even tended to effect the commission of the offense intended by Church. Church's liability was predicated, instead, on his own acts of soliciting, making final arrangements with, and giving the go-ahead to the supposed agent. The same point is made in *Commonwealth v. Peaslee*:

> On the other hand, if the offense is to be made out by showing a preparation of the room, and a solicitation of some one else to set the fire, which solicitation, if successful, would have been the defendant's last act, the solicitation must be alleged as one of the overt acts.

59 N.E. at 57. In such a case, once the accused and the agent complete their arrangements and the accused gives the agent the go-ahead, whether or not the target offense is completed depends entirely upon circumstances beyond the accused's control, the accused having performed, as far as he, himself, is concerned, "the final [act] towards the completion of the offense" contemplated by the apportionment of participation between himself and the agent.

As thus formulated, the rule of *Church* is entirely consistent with even the rigorous common-law rule of attempts. If the *Church* rule was applied to this case, it would not be legally irreconcilable for OS3 Haeger to be guilty of an attempt to deliver, even though the appellant, absent some theory of vicarious liability, was not. There exists, of course, a difference between this case, on the one hand, and *Church, Martinez*, and *People v. Bush*, on the other, in that in the latter cases the respective accused/defendants were mistaken as to the capacity and intent of the supposed agents, whereas in this case the appellant was a real-life conspirator who actually intended, when given the classified material by OS3 Haeger, to deliver it to Soviet representatives. It would seem, however, that such difference, if pertinent at all, would weigh in favor of, not against, imposing liability on OS3 Haeger, because it made consummation of the attempt all the more probable.

By conspiring with the appellant, opening the safe, removing the classified material, and placing it in the appellant's hands, all with the understanding and shared criminal purpose that the appellant would then take it to Washington and deliver it to representatives of the Soviet Union, OS3 Haeger did, indeed, perform the final act towards completion of the offense contemplated by the apportionment of participation between himself and the appellant. It must be conceded, however, that in *Church* and other cases cited, the party sought to be held directly liable for attempt was the instigator of the crime and the maker of an explicit solicitation; and it remained clear throughout the undertaking which party was the principal and which the agent (or supposed agent). In this case the appellant was the instigator and was responsible for the initial solicitation of OS3 Haeger to obtain the classified material. Nonetheless, by virtue of the conspiracy between the appellant and OS3 Haeger, each party became the agent of the other, and specifically with regard to delivery of

the classified material to the Soviets, the appellant functioned as the agent of OS3 Haeger as well as for himself as a principal. There was, of course, no explicit solicitation of the self-motivated appellant by OS3 Haeger, because none was needed. Consequently, under the *Church* rationale, it is arguable that no more should OS3 Haeger be exonerated of attempt because the appellant failed to go far enough towards delivering the material than was *Church* because his supposed agent never took any steps at all to murder his spouse.

In addition to creating a mutual agency, the conspiracy between the appellant and OS3 Haeger provides a basis of vicarious liability for crimes committed during and in furtherance of the conspiracy. *United States v. Candoli*, 870 F.2d 496 (9th Cir. 1989), reflects that a conspirator may be convicted of even a mere attempt committed by other conspirators during and in furtherance of the conspiracy (although the attempt prosecution in that case failed because the conspirators did not exceed mere preparation). If, therefore, OS3 Haeger, by his own actions during and in furtherance of the conspiracy between himself and the appellant, committed an attempt, it would seem that the appellant, as a conspirator, could be convicted of attempt on the basis of OS3 Haeger's attempt even though, by failing sufficiently to perform his own part in the scheme, he would not be guilty of an attempt independently. It would, of course, be ironic to convict the appellant of an attempt that would not exist but for OS3 Haeger's expectation that the appellant would do what the appellant, himself, failed to do, but a marriage of the rule in *Church* with the law of conspiracy may be capable of producing just such an offspring. (In a jurisdiction which recognizes voluntary abandonment as a defense even after an attempt is complete, such a defense, if otherwise made out, probably ought to be available in this unusual situation, although presumably it would not be in other kinds of vicarious liability attempts. For the reasons indicated in the *per curiam* opinion, however, voluntary abandonment is not available in this case).

In any event, to affirm this attempt conviction on the basis outlined above would be to change completely the theory of the case. Not only would it mean that the appellant's conviction was upheld on a theory which was never explained to him and which he might never have understood at trial, *see United States v. Craney*, 1 M.J. 142 (C.M.A.1975), but it would also have the effect of depriving him of an opportunity to present a defense, if any he had. While the failure of a judge in his advice to an accused in a guilty-plea case to expound upon vicarious liability is not prejudicial so long as the accused understands that the case is being tried on that theory, *United States v. Crouch*, 11 M.J. 128 (C.M.A.1981), that doctrine has, to my knowledge, never been held to permit affirmance on a theory of vicarious liability when the guilty pleas were entered and the case was actually tried on the theory of direct perpetration.

Accordingly, I join in the disposition indicated in the *per curiam* opinion.

HOLDER, Judge (concurring in part/dissenting in part):

I concur with my brothers' disposition of this case with the exception of that portion of the opinion dealing with appellant's allegation that his plea to Charge II and the specification thereunder was improvident. I find that appellant's plea was provident and I would sustain the trial court's finding of guilty of attempted espionage. In so finding, I adopt what I understand to be Judge Cox's practical approach to determining the "actus reus" necessary for conviction of attempt under Article 106a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 906(a) that focuses on the totality of circumstances of a particular case and not on linguistic formulations. *United States v. Church*, 32 M.J. 70 (C.M.A.1991); *United States v. Wagner*, 884 F.2d 1090, 1096 (8th Cir.1989), *cert. denied*, 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990).

The elements of the offense of attempted espionage are:

(a) That the accused did a certain act;

(b) That the act was done with the intent to commit the offense of espionage;

(c) That the act amounted to more than mere preparation; and

(d) That the act apparently tended to bring about the offense of espionage.

Article 106a, UCMJ.

My brothers find that the acts of appellant amounted to no more than mere preparation. I disagree. In early Fall, 1989, appellant and OS3 Haeger entered into an agreement to take classified information from the Combat Information Center on board USS FAIRFAX COUNTY and sell it to representatives of the Soviet Union. To effect the object of their agreement, OS3 Haeger and appellant entered the Combat Information Center on board USS FAIR-FAX COUNTY and, thereafter, OS3 Haeger opened the Naval Warfare Publications Library safe and removed 12 classified microfiche. OS3 Haeger handed the microfiche to appellant, who in turn put the microfiche in his locker on board USS FAIRFAX COUNTY. While the microfiche was in his locker, appellant, during 29 and 30 October, 1989, made at least three phone calls to the Soviet Embassy in Washington D.C. to arrange the sale of the microfiche. Appellant was told to bring the microfiche to the embassy in Washington, D.C. (R. 67). Appellant then removed the microfiche from his locker aboard USS FAIRFAX COUNTY, put the microfiche in his coat pocket and started toward Washington D.C. on a borrowed motorcycle. Appellant testified during the providency inquiry that he changed his mind. In view of his continued efforts to get transportation by car from another person when he stopped on the trip, I find the logical inference to be that appellant changed his mind about riding a motorcycle to Washington D.C. My brothers reached the conclusion, and I agree, that appellant never abandoned his quest to sell the microfiche to the Soviet Embassy. I find that the criminal acts of removing the microfiche from the safe, putting the microfiche in his locker, calling the Soviet Embassy to make a deal, reaching what appellant believed to be a deal, taking the microfiche from his locker, getting on the motorcycle and heading toward Washington D.C. amounted to more than mere preparation. Indeed, I find appellant's acts to be substantial steps toward commission of the crime, strongly corroborative of the firmness of appellant's criminal intent. *United States v. Presto,* 24 M.J. 350 (C.M.A.1987). Appellant's overt acts need not be the last act essential to the consummation of the offense. The Manual for Courts–Martial, United States, 1984, lists the following explanation:

> For example, an accused could commit an overt act, and then voluntarily decide not to go through with the intended offense. An attempt would nevertheless have been committed, for the combination of a specific intent to commit an offense, plus the commission of an overt act directly tending to accomplish it, constitutes the offense of attempt. Failure to complete the offense, whatever the cause, is not a defense.

Para. 4c(2), Part IV.

The majority opinion affirms the finding of guilty of conspiracy, of specifically intending to sell classified materials to the Soviet Embassy, and, in furtherance of that conspiracy, removing the microfiche from the USS FAIRFAX COUNTY and driving toward the Soviet Embassy in Washington, D.C.

I would affirm the finding of guilty to Charge II and the specification thereunder. I would affirm the sentence as adjudged.