**UNITED STATES of America,**
**Plaintiff,**

v.

**James R. HOFFA, Benjamin Dranow, Zachary A. Strate, Jr., S. George Burris, Abe I. Weinblatt, Calvin Kovens and Samuel Hyman, Defendants.**

**No. 63 CR 317.**

United States District Court
N. D. Illinois, E. D.

Sept. 22, 1967.

**142**

Donald Page Moore, Dept. of Justice, Washington, D. C., for the Government.

Maurice J. Walsh, Chicago, Ill., Morris A. Shenker, St. Louis, Mo., for defendant, Hoffa.

Richard E. Gorman, Chicago, Ill., for defendant, Burris.

Jacques M. Schiffer, Rockville Centre, for defendant, Weinblatt.

Charles A. Bellows, Harvey M. Silets, Chicago, Ill., for defendant, Kovens.

George F. Callaghan, Chicago, Ill., for defendant, Strate.

Frank Ragano, Tampa, Fla., for defendant, Dranow.

## OPINION AND FINDINGS

AUSTIN, District Judge.

Following a trial by jury, defendants were found guilty in August 1964 of conspiracy and mail and wire fraud and on appeal these convictions were affirmed. United States v. Hoffa, et al., 367 F.2d 698 (C.A. 7, 1966). Thereafter, petitions for writ of certiorari to the Supreme Court of the United States were filed. In response thereto, the Solicitor General, *sua sponte,* advised the Court that on December 2, 1963, some six months after the indictment, agents of the Federal Bureau of Investigation, through use of electronic recording equipment installed by trespass in the office of a Benjamin Sigelbaum, overheard and recorded a conversation between the defendant Burris and Sigelbaum. This equipment had been installed and maintained on Sigelbaum's office for about a year previous thereto. He also informed the Court that the recording was only "peripherally relevant to the charges underlying [Burris'] conviction;" that the information thus obtained "was not introduced into evidence at trial, that it was never the basis of any investigative lead, and that it was in part already known, through Burris' own statements to government attorneys." The Court nevertheless was impelled to grant each of the defendants an opportunity to evaluate the Solicitor General's revelation and "to establish, if he can, that the interception of this particular conversation, or any other conversations, vitiated in some manner his conviction." Hoffa, et al. v. United States, 387 U.S. 231–233, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967). In remanding, the Supreme Court directed the District Court to "confine the evidence presented by both sides to that which is material to the questions of the content of this and any other electronically eavesdropped conversations, and of the relevance of any such conversations to the petitioners' subsequent convictions." Hoffa, et al. v. United States, supra, pp. 233–234, 87 S.Ct. p. 1584.

The indictment in this case was the third of a series involving the defendant Hoffa and the Sun Valley development in Florida. The original indictment was returned on December 7, 1960 at Orlando, Florida and dismissed on July 12, 1961 because of the improper empanelling of the Grand Jury. United States v. Hoffa, et al., 196 F.Supp. 25 (D.C.Fla.1961). A second indictment involving the same defendant and the same subject matter was returned on October 11, 1961 at Orlando, Florida. That indictment was dismissed on June 4, 1963, the same day that the Chicago indictment was returned. In point of time, therefore, the overheard conversation of December 2, 1963 was nearly three years after the return of the original Florida indictment and six months after the return of this indictment.

The government has now introduced in evidence two Federal Bureau of Investigation Reports, which are summaries of the admitted overhearing of December 2, 1963. Plaintiff's Exhibits 2–3 and 3–1. Except for the December 2, 1963 overhearing and nine additional overhearings, the government has sworn by affidavit that the Federal Bureau of Investigation after diligent search of its files, records and indices had found no other records of any overhearings of any conversations by defendants. The records of the nine overhearings were tendered to the Court in a sealed envelope for an *in camera* inspection, Plaintiff's Exhibit 1–A. The Court has carefully read this Exhibit which discloses extremely brief overhearings that contain no information either remotely or peripherally relevant to the transactions and evidence on which these defendants were indicted and convicted. Plaintiff's Exhibit 1–A has been resealed and is available for review purposes. Affidavit evidence was also presented by the government that the Internal Revenue Service had caused a diligent search to be made of its records, files and indices and found no record of any electronically eavesdropped overhearings of any conversation by these defendants.

The next phase of the government's evidence was directed to establish that not only was all the information contained in the December 2, 1963 electronically eavesdropped overhearings known to the government long prior to the overhearings, but that the information so procured did not furnish the government any investigative leads. Plaintiff's Exhibits 4–27.

A log of the December 2, 1963 overhearing reveals eleven items of information, Plaintiff's Exhibit 1: (1) Burris' interest in Sun Valley; (2) Dranow's interest in Sun Valley; (3) Sigelbaum's interest in Sun Valley; (4) Hoffa's interest in Sun Valley; (5) that either Dranow's or Sigelbaum's interest in Sun Valley was subject to a bank claim; (6) that there was a $57,000 transaction with Irving Kipnis; (7) that Willis was the Trustee; (8) that Burris got money from "The Airport"; (9) the protections surrounding the granting of loans from the pension fund; (10) that Hyman spent the loans differently than he should have; and (11) the use of the word "bail-out".

As to each of these items, the Court finds that the evidence establishes prior knowledge by the government of

(1) Burris' interest in Sun Valley from (a) Burris' sworn testimony before the McClellan Committee on 6/29/59 and 10/21/59 set forth in government's Additional Appendix, pp. 74 and 92; (b) an FBI interview with Burris dated 10/2/62, Plaintiff's Exhibit 19; (c) an interview with J. Friedman dated 11/15/60, Plaintiff's Exhibit 5.

(2) Dranow's interest in Sun Valley from the same sources as Burris' and also a statement of Edwin H. Willis dated 12/22/60, Plaintiff's Exhibit 9.

(3) Sigelbaum's interest in Sun Valley from (a) an FBI interview with Sigelbaum dated 11/15/60, Plaintiff's Exhibit 4; (b) an FBI interview with J. Friedman dated 11/15/60, Plaintiff's Exhibit 5; (c) a statement of Edwin H. Willis, dated 12/22/60, Plaintiff's Exhibit 9.

(4) Hoffa's interest in Sun Valley from an FBI interview with Burris dated 6/12/60, Plaintiff's Exhibit 17.

(5) a bank having a claim with reference to Dranow's or Sigelbaum's interest in Sun Valley, from Lou Poller's Grand Jury testimony of October 1962, Plaintiff's Exhibit 25, pp. 45–46.

(6) the $57,000 transaction with Irving Kipnis, from (a) an FBI interview with Kipnis dated 7/2/62, Plaintiff's Exhibit 6; (b) an FBI contact with Kipnis dated 7/31/62, Plaintiff's Exhibit 7; (c) an FBI interview with Kipnis dated 10/31/63, Plaintiff's Exhibit 8; (d) a signed statement by Kipnis dated 5/31/63, Plaintiff's Exhibit 11; (e) an IRS interview with Kipnis dated 8/6/62, Plaintiff's Exhibit 12; (f) Grand Jury testimony of Kipnis dated 9/18/62, Plaintiff's Exhibit 22; (g) Grand Jury testimony of Kipnis dated 9/18/62, Plaintiff's Exhibit 23.

(7) Willis being Trustee, from (a) an FBI interview with Sigelbaum dated 11/15/60, Plaintiff's Exhibit 4; (b) an FBI interview with Friedman dated 11/15/60, Plaintiff's Exhibit 5.

(8) Burris getting money from "The Airport", from (a) an FBI interview with Jack Cooper dated 2/15/61, Plaintiff's Exhibit 10; (b) an FBI interview with George Simon dated 2/14/61, Plaintiff's Exhibit 15; (c) a signed statement of George Simon dated 2/2/61, Plaintiff's Exhibit 16.

(9) the protections surrounding the granting of loans, from (a) the Grand Jury testimony of Morris Lieberman dated 2/8/62, Plaintiff's Exhibit 20; (b) the Grand Jury testimony of Stanford Clinton dated 10/17/62, Plaintiff's Exhibit 26;

(10) Hyman spending the loan funds differently than he should have, from (a) Hyman's interviews with FBI agents on 1/30/61, 6/20/61, and 7/7/61 as appears in the Appendix of this case at page 900 in which Hyman told the FBI agent that he had used $100,000 of the first loan to buy an interest in Sun Valley which necessitated the taking out of the second loan; (b) the Grand Jury testimony of Canavan dated 9/11/62, Plaintiff's Exhibit 21; (c) the Grand Jury testimony of Hyman dated 10/10/62, Plaintiff's Exhibit 24; (d) the Grand Jury testimony of Cecil Black of 8/27/62, Plaintiff's Exhibit 27; (e) the testimony of Agent Connors who testified in this hearing that in 1962 he examined Hyman's books and records for 1960 and 1961.

(11) the use of the word "bail-out", from the testimony of the witness Langford, Appendix page 1400, who said that Hyman in 1960 asked him how much it would take to bail-out Sun Valley.

The defendants' evidence falls into three categories. First, they sought to elicit information from Justice Department employees, present and past, Federal Bureau of Investigation employees, and Internal Revenue Service employees that there were other overhearings or records thereof that were not disclosed in the government's case. This effort was unsuccessful for their testimony corroborated the evidence submitted by the government.

An important background factor to an evaluation and consideration of the next two categories is the defense evidence that at some time prior to Januray 1, 1967 there was outstanding a reward for $200,000 which was publicly offered for any information leading to proof of wiretapping by any federal agent of the telephone of Mr. Hoffa.

The second category related to evidence of electronic eavesdropping, or suspected electronic eavesdropping, of Mr. Hoffa, his attorneys and employees. Mr. Ragano, one of the attorneys in this case, filed an affidavit that he suspected that his office and home phones in Florida were wiretapped in the early 1960's with the knowledge of the Southern Bell Telephone Company. No other evidence was presented to confirm this suspicion. The officials of Southern Bell, after defense subpoena were issued, averred by affidavit that a search of the files of that company revealed no

such evidence existed. Mr. Bufalino, one of Mr. Hoffa's lawyers, testified that about the middle of November 1961, an electronic eavesdropping device was found by local authorities in the hotel room of a Mr. Haggerty, another of Hoffa's lawyers, and was removed by them. Mr. Bufalino admitted he had no personal knowledge as to who placed the device in Mr. Haggerty's room. Charles J. O'Brien, the defendant in O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), testified that about January 1964 he was investigating Sun Valley for attorneys Haggerty and Bufalino and had talked to them on his phone about his investigation. The suspected trespass on Mr. Ragano's telephone and the actual trespass in Mr. Haggerty's hotel room fall far short of a permissible conclusion that these were made by the government; in any event, none of the testimony of these three witnesses discloses that any of these defendants were overheard.

The testimony of Harold Jenkins, a private investigator from Miami, Florida, purports to directly implicate the government in a wiretap of the defendant Hoffa. In substance, Jenkins testified that in January 1961 Mr. Wiggins, a manufacturer of electronic surveillance equipment, called him on behalf of a purchaser of a phone tapping unit who needed a local installation man; that he met the purchaser, a Mr. Fetterman, who represented himself to be an IRS agent and flashed a leather folder at him which he did not examine; that Mr. Fetterman told him he wanted the device installed at Room 1102 at the Eden Roc Hotel in Miami Beach, Florida, and also arranged to have the same monitored by Jenkins; that it was installed sometime in February 1961; that such monitoring was done for a period of ten days and the records thereof turned over to Fetterman. Jenkins learned that the occupant of that room was Mr. James Hoffa. Mr. Fetterman paid him $400 and still owes a balance of $350 which Jenkins never sought to collect from either Fetterman or his superiors at

IRS. He testified that he revealed the incident for the first time to Frank Short, another investigator, sometime in 1965; that the next time was by affidavit on January 16, 1967 given to Short the day after Short informed Jenkins of a $100,000 reward offered by the Teamsters' Union for any information leading to proof of wiretapping by any federal agent of Mr. Hoffa's telephone; before executing such affidavit Jenkins discovered the reward was $200,000, that Short wanted a part thereof because he could help with the connections and paper work involved, but the amount of the split was not agreed upon. Jenkins met Lou Poller, a Miami representative of the Teamsters' on January 17, 1967 and that night he, Short and Poller flew to Washington where at Teamster headquarters they met with twelve men, among whom were Messrs. Hoffa, Kovens and Bufalino. Jenkins admitted that his motivation in the matter was strictly money although he did not reveal that to Mr. Poller.

The defense had subpoenaed a Mr. Fetterman, an agent for the IRS, who was in the witness room waiting for a call for his testimony. The record shows that government counsel made repeated inquiries of the defense on Fettermans' behalf as to when he would be called. Eventually, defense counsel revealed the information that Mr. Jenkins had seen and observed Mr. Fetterman during the course of this hearing and did not recognize him as being the man under whose direction he had installed the unit. Presumably, because of this lack of identification, Mr. Fetterman was not called to testify for the defense.

Jenkins' testimony was the only evidence which the defense submitted to establish that a wiretap was placed on Mr. Hoffa. This testimony, even if believed in the light of its admitted motivation, fails to prove the essential ingredient that the wiretap was instigated, installed, maintained in operation and recordings therefrom received by and

through the activity of any agent of the federal government.

The third category concerns testimony of an alleged offer from a former government employee to furnish the defendant Strate with information on government wiretapping and electronic eavesdropping in exchange for information that would discredit New Orleans District Attorney Jim Garrison and stop the Kennedy assassination investigation. This testimony was given by the defendant Strate and a New Orleans jurist, Judge Malcolm O'Hara. Because of its nature, its interesting nuances and the weight to be given it, its substance is here set forth. It revealed that these two witnesses were intimate friends, saw each other daily for the last fifteen or sixteen months, played golf together, went to the race track together, ate lunch and dinner together hundreds of times, and that the defendant Strate paid for Judge O'Hara's transportation and hotel bills on trips to Las Vegas and to Washington. Their firm friendship was also revealed through Judge O'Hara's testimony regarding the Partin incident, to be discussed later, when he stated he acted as a messenger boy on that occasion because Strate had asked him to do so, and Strate's testimony that Judge O'Hara complied with his request on the Partin incident because he asked him to do it. Judge O'Hara also testified that whenever they visited Washington they visited the Teamsters' headquarters and he had there met Mr. Fitzsimmons, Mr. Kovens and Buddy Gill, former administrative assistant to Senator Russell Long; that during one of his visits to Washington with Strate one of the discussions at the Teamsters' headquarters concerned Mr. Hoffa being incarcerated at the Lewisburg Penitentiary and how his situation could be alleviated by removal to some other place of confinement.

The touchstone for the testimony of both involved a Mr. Walter J. Sheridan, an employee of the National Broadcasting Company, who had been a former employee of the Department of Justice during the Hoffa trials. Both testified that he was present with them on June 12, 1967 at the Bourbon-Orleans Hotel in New Orleans. The circumstances and the reasons for that meeting are conflicting.

Mr. Strate testified on direct-examination that his meeting with Mr. Sheridan was prearranged, with his consent, by Judge O'Hara who had asked whether he would like to meet Sheridan. During cross-examination Mr. Strate stated he never told Judge O'Hara he had wanted to see Mr. Sheridan; that he first found out he was to meet with Sheridan about two or three days before it took place; that neither Sheridan nor anyone else had advised him that Sheridan wanted to see him; that Judge O'Hara had told him he was arranging a meeting between Walter Sheridan and Edward Baldwin, a former law partner of the Judge but did not tell him why the meeting was to take place; that he said he was willing to attend it although he didn't know its purpose; he later said that before the meeting Judge O'Hara told him that Baldwin had reported to O'Hara that Sheridan was looking for things that would tend to discredit and destroy Garrison. It was further elicited on cross-examination that Sheridan had asked Strate "Before you go further, what do you want from me?" and Strate's response was, "Hoffa out of jail. You two guys won the war. That is all you wanted, so help us." He admitted that one of the reasons he went to see Sheridan was to get information about bugging or wiretapping in Chattanooga, which reason he repeated several times during the course of his cross-examination; that he told Sheridan that Pershing Gervais was very close to Jim Garrison and if there was anybody that could destroy him, it would be him; that his trading point with Sheridan was for evidence he thought Sheridan had on wiretapping in Chattanooga.

From Judge O'Hara's testimony it appears the meeting with Sheridan was a result of Baldwin's information received from Sheridan that the latter had seen a rerun of O'Hara's television tapes when he ran against Garrison for District At-

torney and had told Baldwin that O'Hara had been in Baton Rouge and talked with a government witness in the Chattanooga trial, which O'Hara admitted; whereupon the Judge told Baldwin he would like to meet Sheridan but that if there was such a meeting he would bring someone with him.

At this meeting, Strate stated that while he and Sheridan were alone a discussion ensued about Sheridan's offer to give him wiretapping and room bugging evidence which would help him in the Chicago hearing if Strate would help discredit District Attorney Garrison; that he assumed Sheridan was working for Robert Kennedy; that he demurred, having no intention of discrediting Garrison, but only wanted information about wiretapping in Chattanooga; that nothing was agreed to between them; that when Judge O'Hara and Baldwin rejoined them, in their presence Sheridan said to Strate, "Why don't you let me help you in Chicago?" This was corroborated by Judge O'Hara on his direct. Strate also knew that Sheridan was subpoenaed to appear before the September Grand Jury for New Orleans Parish empanelled by Judge Malcolm O'Hara, who was Strate's intimate friend.

The government also elicited from Mr. Strate that Judge O'Hara at Strate's request had met with Edward Brady Partin in Baton Rouge, a government witness in the Chattanooga trial, which had been arranged by Mr. Gill and took place in Mr. Gill's office; that the Judge had a predrafted affidavit for Partin to sign in which he confessed wiretapping; that the document had been prepared without ever interviewing Mr. Partin and the Judge asked Partin to sign the affidavit without asking him whether it was true or not; that the Judge did this because Strate had asked him to do so; Judge O'Hara told Strate that Partin had refused to sign such affidavit.

Judge O'Hara on cross-examination confirmed that in the latter part of February 1967, he, his court reporter, Mr. Levy, and Mr. Strate drove to Baton Rouge to meet Mr. Partin as arranged through Mr. Gill; that he had an affidavit which had been dictated by Harold Brown, an attorney in Chattanooga, Tennessee to his court reporter in Mr. Strate's apartment in New Orleans; that Brown told Judge O'Hara he was one of the attorneys in the Hoffa Chattanooga case; that the Judge had glanced at the contents and saw it contained some allegations with reference to wiretapping in Chattanooga; that he gave the affidavit to Mr. Partin, asked him to read it and that if it was correct, would he sign it; that his role with the affidavit was that of messenger boy and he did it because Strate asked him to.

Mr. Walter J. Sheridan had been subpoenaed by defendants and was waiting in the witness room to be called. The defense, however, did not call for his testimony.

Because of the many conflicts and contradictions in the testimony given by these two close friends, the unquestioned obedience imposed by this friendship, the contradictions in Strate's testimony alone, his declared personal concern for Mr. Hoffa's predicament, all indicate an interest and motivation which casts such doubt upon the credibility of their testimony and this Court refuses to place any credence on it. In any event, even if accepted as true, it fails to show that there were any overhearings of conversations by any of these defendants by the government.

The Court concludes from all the evidence adduced on this hearing, that the government obtained no new information from the electronically eavesdropped overhearings in the record and that none of the overhearings had any relevance to the convictions of any of the defendants. The Court further finds that the convictions of none of the defendants were tainted by the use of evidence improperly obtained.

The motion for a new trial, if such it is, is overruled and a new final judgment on the verdict is hereby entered against all of the defendants with the exception

of Hyman, whose death was suggested during the course of the hearing. The same sentences heretofore imposed on each of the defendants are hereby reimposed.