**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James R. HOFFA, Benjamin Dranow,
Zachary A. Strate, Jr., S. George Burris,
Abe I. Weinblatt, Calvin Kovens, De-
fendants-Appellants.**

**No. 16634.**

United States Court of Appeals
Seventh Circuit.

Aug. 15, 1968.

Rehearing Denied Nov. 7, 1968.

Harvey M. Silets, Richard E. Gorman, Maurice J. Walsh, Chicago, Ill., Morris A. Shenker, St. Louis, Mo., Frank Ragano, Tampa, Fla., George F. Callaghan, Chicago, Ill., Jacques M. Schiffer, Long Island, N. Y., Raymond E. LaPorte, Tampa, Fla., for defendants-appellants.

Thomas A. Foran, U. S. Atty., Chicago, Ill., Jerome M. Feit, Dept. of Justice, Fred M. Vinson, Jr., Asst. Atty. Gen., Beatrice Rosenberg, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee; Michael T. Epstein, Washington, D. C., of counsel.

Before CASTLE, Chief Judge, DUFFY, Senior Circuit Judge and SWYGERT, Circuit Judge.

DUFFY, Senior Circuit Judge.

In August 1964, following a jury trial, defendants were found guilty on various counts contained in an indictment charging them with wire and mail fraud in the procurement of loans from the Teamsters Union Pension Fund, and of conspiracy to commit the substantive offenses stated. 18 U.S.C. §§ 1341, 1343, 371. This Court, one judge dissenting, affirmed the convictions. United States of America v. Hoffa et al., 7 Cir., 367 F.2d 698 (1966).

## EAVESDROPPING

In response to a petition for a writ of certiorari before the Supreme Court, the Solicitor General urged that none of the issues raised by the defendants warranted the issuance of the writ. However, acting *sua sponte*, the Solicitor informed the Supreme Court that on or about January 21, 1963, the Federal Bureau of Investigation installed a microphone by trespass in the office of one Benjamin Sigelbaum, Miami, Florida, and that this electronic device was maintained on such premises until July 12, 1965; that on December 2, 1963, some six months after the return of the June 4, 1963 indictment in this case, defendant Burris visited Sigelbaum's office and engaged in a conversation with Sigelbaum which was electronically overheard through this device; that a verbatim transcript of the conversation appeared in the Federal Bureau of Investigation's logs and was summarized in an FBI report.

The Government pointed out that the overheard conversation was not introduced into evidence at the trial of Burris and his co-defendants. It further represented that any conceivably relevant information was theretofore known to the Government from wholly independent sources. It represented that the information had no relationship to any of the defendants except Burris. The Government suggested to the Supreme Court that if a remand for a hearing be ordered, it should be as to defendant Burris only.

Without reaching the issues raised in the petition, the Supreme Court remanded the case to the District Court for a hearing on the issue of electronic eavesdropping. In its opinion, the Supreme Court said that its purpose in ordering the hearing was to provide each of the defendants with "an opportunity to establish, if he can, that the interception of this particular conversation, or of other conversations, vitiated in some manner his conviction." Hoffa et al. v. United States, 387 U.S. 231, 233, 87 S. Ct. 1583, 1584, 18 L.Ed.2d 738 (1967). The District Court was directed to hold a hearing and to "confine the evidence presented by both sides to that which is material to questions of the contents of this and any other electronically eavesdropped conversations, and the relevance of any such conversations to petitioners' subsequent conviction." (387 U.S. at 233–234, 87 S.Ct. at 1584).

The District Court was instructed that if it found taint resulting from any such intercepted conversations, it was to direct a new trial as to the particular defendant whose conviction was thus found to be infected; if it found no taint, it was to enter new final judgments of conviction. (387 U.S. at 234, 87 S.Ct. 1583)

A hearing was held before District Judge Austin. United States of America v. Hoffa, et al., 273 F.Supp. 141 (N. D.Ill., E.D., 1967). The Court stated it would require the Government to establish *prima facie* that the overheard Burris-Sigelbaum conversation of December 2, 1963 did not taint any of the convictions, and that there were no other "electronic trespasses" which resulted in the obtaining of any evidence "which

aided in the convictions in this case." The District Court considered this category to include any electronically eavesdropped conversations in which any of the defendants participated. The District Court also directed the Government "to disclose what electronically eavesdropped conversations involving these defendants that there is a record of in the Federal Bureau of Investigation and in the Internal Revenue Department * * *."

The District Court stated that the defense would be permitted to "produce whatever evidence [it] can find in regard to electronic eavesdropping involving the other defendants in this case, or the lawyers in this case, in which this trial was discussed, or preparations for this trial were discussed."

At the District Court hearing, government counsel represented that in addition to the Sigelbaum-Burris conversation, it had in its possession nine logs of "certain isolated, accidental and absolutely irrelevant overhearings of some of these defendants."

The Government introduced an affidavit from Charles Bolz, Chief of the Accounting and Fraud Section of the FBI. This affidavit stated that diligent searches of the FBI records regarding electronic eavesdropping of conversations participated in by any of the defendants in this case disclosed only the Burris-Sigelbaum conversation of December 2, 1963, and the conversations which were contained in sealed Exhibit 1-A. This sealed exhibit was attached to the Bolz affidavit. At the Court's direction, the Government turned Exhibit 1-A over to the Court for an *in camera* inspection. There were no existing notes or tapes of the conversations in Exhibit 1-A.

At the conclusion of the inspection of all the logs contained in Exhibit 1-A, the District Court concluded that they were not remotely relevant to the issues in this case and denied the request of the defendants to examine same. The District Court ordered that the logs be resealed and made available to this Court on appeal.

■ At the conclusion of the oral argument on this appeal, the three members of this panel examined the logs contained in Exhibit 1-A. We agree with the District Court that nothing contained therein is relevant to the issues in this case.

An affidavit by Loren Green, Deputy Assistant Commissioner of the Internal Revenue Service, also was read into the record at the hearing. This affidavit stated that searches had been made of the records of the Internal Revenue Service, but that these searches failed to disclose records of any electronic overhearings on the part of the defendants.

Defendants moved to strike the Bolz and Green affidavits. These motions were denied. The District Court pointed out that no restrictions would be placed on the defendants calling these affiants as witnesses or otherwise, in an endeavor to establish the alleged falsity of their affidavits. The defense never sought to call either Bolz or Green as a witness for cross examination or otherwise.[1]

Upon oral argument of this appeal, the Court asked defense counsel what cross examination, as a practical matter, could have been had, other than asking the witness if he had searched the records and that no records of eavesdropping had been found.

Counsel for defendant Hoffa told the Court that he would have demanded the right to examine all of the index cards which the witness had checked in his search. In other words, counsel, in effect, argued that he desired the right to freely examine the records and files of the FBI.

---

1. Joseph Harmon who, in 1963, was Assistant Chief of the Intelligence Division of the Internal Revenue Service, was called as a defense witness at the hearing. He testified that to his knowledge there was no electronic eavesdropping or wire tapping of any conversations of the defendants in the instant case from 1961 through 1964.

■ We hold that no prejudicial error was committed in receiving into evidence the affidavits of Bolz and Green. (Rule 27, Fed. Rules of Criminal Procedure). Also, the District Court did not err in examining the FBI records *in camera*. United States v. Battaglia and Evans, 394 F.2d 327 (7 Cir., 1968). Such procedure, in any event, could be no more than harmless error. Chapman et al. v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If *certiorari* should be granted in this case, the nine logs of "certain isolated, accidental and absolutely irrelevant overhearings of some of these defendants" will be available for inspection and examination by the Supreme Court.

■ The District Court concluded "that the government obtained no new information from the electronically eavesdropped overhearings in the record and that none of the overhearings had any relevance to the convictions of any of the defendants." (273 F.Supp. at page 147). The record sustains this finding and conclusion.

The District Court found "that the convictions of none of the defendants were tainted by the use of evidence improperly obtained." (273 F.Supp. at page 147). We agree!

■ The Court made particular reference to the nine overhearings submitted to the Court for *in camera* inspection. The Court found that they "contain no information either remotely or peripherally relevant to the transactions and evidence on which these defendants were indicted and convicted." (273 F. Supp. at page 143). Again, we agree!

The District Court denied motions for a new trial, entered new final judgments of conviction against each of the defendants, and reimposed the original sentences. (273 F.Supp. at pages 147 and 148).

It should be kept in mind that the detailed indictment which was returned against the defendants on June 4, 1963, was some six months prior to the date of the conversation between Burris and Sigelbaum. The indictment spelled out in detail the roles played by each of the defendants in seeking and obtaining inflated loans from the Teamsters Pension Fund. The indictment also charged that defendant Hoffa used his position as a trustee to influence the approval of such fraudulent loan applications.

The indictment mentioned all of the loan transactions which were proved at the trial including Hyman's Key West Foundation and the Miami Airport hotel loans, both of which were mentioned in the Burris-Sigelbaum conversation.

It is apparent the charges made against the defendants in the indictment were drawn in such detail and particularity that they could have come only from a full investigation of all the facts underlying the scheme. It is neither conceivable nor realistic to believe that this information could have been obtained from a cryptic half hour conversation which occurred six months after the indictment had been returned.

It seems clear that the Government's case against the defendants was based upon years of extensive investigation which was initiated and completed long before the unintended and unplanned overhearings of defendant Burris on December 2, 1963.

It also seems significant to us that the overhearing occurred as the result of a surveilance of Sigelbaum and was not the product of any investigation conducted as to any defendant in this case. It is our decision that the District Court was correct in concluding that any possibly relevant information contained in the talk between Sigelbaum and Burris was known to the Government from wholly independent sources.

There is nothing in the evidence at the hearing to indicate that the Government used the memoranda summarizing the overheard conversations.

■ At the oral argument on this appeal, the attorney who represented the Government disclosed for the first time in any court proceeding, that eavesdropping of certain attorneys had occurred.

The attorney handed to this Court a sealed folder which contained the FBI logs of the conversations. We have examined *in camera* the contents of the sealed folder and have concluded that the information is completely irrelevant to the Hoffa case before this Court. Since this information is completely irrelevant, we see no need to remand the case to the District Court for findings and conclusions regarding the contents of this folder. United States v. Battaglia and Evans, 394 F.2d 327 (7 Cir., 1968). This is not to say that this Court sanctions eavesdropping of attorneys. We do not. However, the conversations overheard are irrelevant. This case is therefore unlike O'Brien et al. v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967) and Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966). In the latter two cases, the attorney-client relationship was breached. No such circumstances are presented here. cf. Granello et al. v. United States, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967).

## NONPRODUCTION OF DOCUMENTS

The defendants argue to this Court that FBI Agent, John Connors' memoranda of December 26, 1963 and January 11, 1964, summarizing the eavesdropped conversation of Burris and Sigelbaum, and Connors' memorandum of October 8, 1963, relating to the preparation of the summaries, should have been disclosed to the defendants at the trial. Defendants' argument is based on the disclosure policy of 18 U.S.C. § 3500. The basic requirement of 18 U.S.C. § 3500 is that "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement * * of the witness in the possession of the United States which relates to the subject matter to which the witness has testified." Statement is defined as "a written statement made by said witness and signed or otherwise adopted or approved by him; or * * * a stenographic, mechanical, electrical, or other

recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

■■ The memoranda demanded by the defendants failed to meet the statutory requirements of 18 U.S.C. § 3500. The purpose of this statute is to disclose to the defendants those statements which are relevant to the witness' cross examination. Palermo v. United States, 360 U.S. 343, 349–351, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); Rosenberg v. United States, 360 U.S. 367, 370, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). This test is not met. Connors testified as an accounting expert for the United States at the trial. He testified that defendant Hyman did not, in 1960, incur expenditures for his Key West Foundation in the amount he had represented to the Pension Fund of the Teamsters Union. Connors' memoranda of the Burris-Sigelbaum conversation did not relate to his accounting testimony. Therefore, the conclusion is inescapable that it had no impeachment value to the defendants.

■ Defendants contend that the Burris-Sigelbaum conversation revealed that Hyman spent the Pension Fund loan in 1961 in accord with his agreement with the Pension Fund. The fraud was the false representations made in 1960; the manner in which Hyman spent the money in 1961 is irrelevant. In any event, the defendants knew how Hyman spent the money. As the Supreme Court said in *Rosenberg*, supra, page 371, page 1234 of 79 S.Ct. "Since the same information that would have been afforded had the document been given to defendant was already in the possession of the defense * * * it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect the * * *" documents.

■ Defendants also argue that nondisclosure of the log of the Burris-Sigelbaum conversation and two summaries of the eavesdrop log which were

prepared by Connors, violated their constitutional right to due process. Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) and Giles et al. v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). *Brady* makes clear "* * * that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Since the log and the summaries were not used as evidence at the trial, and since they did not lead to any other evidence which was used at the trial, it cannot properly be claimed that the log and summaries were evidence "material either to guilt or to punishment." (373 U.S. at 87, 83 S.Ct. at 1197).

## OTHER DEFENDANTS NOT PREJUDICED BY BEING TRIED WITH DEFENDANT DRANOW

Relying on evidence as to Dranow's mental competency introduced at the hearing in 1967, the defendants, other than Dranow, urge he was mentally incompetent at the time of the trial in 1964, and therefore they were prejudiced by being tried with him.

Despite the Government's readiness at the trial to have Dranow examined by psychiatrists, and the trial court's willingness to hold a competency hearing based on such examination, it was at the request of defense counsel that such a hearing was postponed until defendants' psychiatrists could conclude the examination of Dranow and had filed their report. The trial court made several inquiries as to any such report but none was ever filed. Under such circumstances, the trial court could properly have concluded that any substantial claim of Dranow's mental incompetency had been abandoned by the defense.

## DECISION IN BRUTON v. UNITED STATES

In defendants' supplemental brief which was filed by permission on the date of the oral arguments on this appeal, it is argued that the recent decision of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) requires a reversal of this case. We disagree!

In *Bruton*, petitioner and one Evans were tried together on the charge of armed postal robbery, 18 U.S.C. § 2114. At the trial, the confession of Evans that he and Bruton committed the robbery was admitted into evidence. The trial judge instructed the jury that although Evans' confession was competent evidence against Evans, it was inadmissible hearsay against petitioner and, therefore, must be disregarded in determining petitioner's guilt or innocence.

The Supreme Court reversed, finding unreasonable the assumption that the jury could consider the confession only as to the confessor. That Court held that in spite of the insulating instruction, the admission of this confession at the joint trial deprived the codefendant (petitioner) of his constitutional right to confront and cross examine his accusers.

In the case at bar, statements made by Burris under oath to a Congressional Committee were read to the jury with the Court admonishing the jury that the questions and answers could be considered by the jury only against the defendant Burris. These statements were not incriminating with respect to the indictment in this case or as to any co-defendant.

The statements to the Committee had to do with the interest of Burris and Dranow in Union Land and Home Company, the purchase by that Company of Hoffa's and Lower's interests in Sun Valley, and the payment by Union Land and Home Company to Teamsters Local 299 of interest on money deposited by the Union in a Florida bank which had made loans to Sun Valley. It is important to note that these were matters about which there was no substantial dispute.

There is nothing in Burris' statements with reference to the procurement of Pension Fund loans by fraud. There was no mention of using Pension Fund loan proceeds to aid Sun Valley in getting out of its financial troubles. The situation which we are here considering is entirely different from the "powerfully incriminating statements" in *Bruton*. There is no good reason to believe that the jury could not follow the limiting instructions of the Court in regard to these statements.

In *Bruton*, supra, 391 U.S. page 135, 88 S.Ct. page 1627, the Supreme Court stated: "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information."

Defendant makes a further argument claiming error in regard to the socalled "Link" letters. These were originally admitted into evidence only as to Dranow, but the Court ultimately excluded them from evidence as to all defendants, including Dranow. The Court gave an appropriate instruction.

This question was fully covered by our original opinion in this case. We can find nothing in *Bruton* that affects the validity of our prior decision on this point.

We note that, unlike the situation in *Bruton*, Dranow was a witness at the trial and was subject to cross examination by his co-defendants. No one prohibited the cross examination of Dranow. It was a matter of trial strategy when the defendants decided not to cross examine.

## ISSUES DECIDED ON FIRST APPEAL

Defendants raise three additional issues on this appeal: 1) that the Government failed to prove a single conspiracy; 2) that the indictment was erroneously delivered to the jury, and 3) that the jury was prejudiced by having seen a certain newspaper article.

All of these issues were fully briefed and argued on the original appeal and were decided by this Court. It is, perhaps, true that this Court has the power to reconsider these issues, but we do not choose to do so. There has been no change in the applicable law since the date of our decision as was the situation in several of the court decisions cited by defendants.

It is true that in our previous decision, one judge dissented. It also is true that all of the judges of this Court except two voted to deny a petition for rehearing en banc.

 We see no reason for not following the well-established "law of the case doctrine" which is that except in unusual and compelling circumstances, appellate courts should not relitigate issues which they already have decided. Smith v. United States, 118 U.S.App.D.C. 133, 332 F.2d 720–721 (1964); United States v. Meredith, 172 F.2d 745, 746 (7 Cir., 1949); 1B Moore's Federal Practice Sec. 0.404 (10) at pages 573 and 574 (2d Ed., 1961). No such unusual and compelling circumstances exist in this case.

Several additional issues have been argued by one or more of the defendants. Inasmuch as we consider them to be without merit, we think further reference to such claims in this opinion is not necessary.

The judgment of the District Court is Affirmed.

SWYGERT, Circuit Judge (dissenting).

I dissent principally on two grounds. First, the Government failed at the hearing to sustain its burden of proving that the convictions were untainted by the illegal eavesdropping on the Burris-Sigelbaum conversation. Second, the Government failed at the trial to disclose to either the district court or the

defense counsel the existence of statements that were arguably within the purview of 18 U.S.C. § 3500.

I.

The salient facts surrounding the illegally overheard conversation and the use the Government made of it are as follows.

During 1962, 1963, and part of January 1964, Federal Bureau of Investigation agent John Connors, who was assigned to the F.B.I. office in Miami, Florida, conducted an investigation of defendant Samuel Hyman and his Key West Foundation Company properties, defendant Calvin Koven's activities in connection with the Pension Fund, and defendant James R. Hoffa's activities in connection with Pension Fund loans. Agent Connors initially examined the records of the Key West Foundation on two separate occasions in 1962. He again examined these records in 1963 and 1964 while he was working in Chicago with the Government prosecutors in preparation for the trial of this case which occurred during the summer months of 1964. At the trial, agent Connors testified on behalf of the Government. His testimony related mainly to the contents of the books and records of the Key West Foundation.

At the hearing in 1967 in the district court, conducted pursuant to the remand ordered by the Supreme Court, Hoffa v. United States, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967), the Government disclosed that a conversation between Benjamin Sigelbaum and the defendant George Burris, occurring on December 2, 1963 in Sigelbaum's Miami, Florida office, had been overheard surreptitiously by means of an electronic device. According to the testimony at the hearing, the two F.B.I. clerks, who were monitoring the conversation, contemporaneously prepared a log of the

eavesdropped conversation.[1] Thereafter the log was routed by an F.B.I. supervisor to agent Connors, although another F.B.I. agent was assigned to the investigation being conducted of Sigelbaum in connection with activity unrelated to the instant case. .

After studying the log, agent Connors prepared a summary report of the information contained in the log. This report, dated December 26, 1963 and containing direct quotations from the log, was sent to F.B.I. headquarters in Washington, D. C. No attempt was made to conceal the fact that the report reflected an overheard conversation.

On January 11, 1964 agent Connors prepared a second report of the information contained in the log. According to agent Connor's testimony at the hearing, this report was a "resubmission of the December 26, 1963 memo after administrative corrections." A comparison of the two reports indicates that, unlike the first report, the second report was written in an attempt to camouflage the fact that the information in the report was obtained from a "bugged" conversation. Copies of this second report were forwarded to the F.B.I. headquarters and also to that agency's Chicago office where it was turned over to the Government prosecutors in charge of the instant prosecution. This copy of the January 11 report shows notations and comments in the margin of the document placed there by the Government attorneys. In addition certain words of the report are underlined, presumably by these same attorneys. The pertinent part of the report, insofar as it concerns the Key West Foundation loans from the Pension Funds, reads: "Burris felt, according to the source, that in the Key West case, *Sam Hyman* used the money a little differently when he first obtained it and then *ultimately put it into*

---

1. The Government produced and filed the log in the district court prior to the hearing. The relevation of the existence of the log occurred when the Government informed the Supreme Court about it during the pendency of the defendants' petition for a writ of certiorari to review the judgment of this court. The Government, however, did not furnish the log to the Supreme Court.

the property."[2] (Emphasis in original.) In the margin of the report adjacent to this statement appears the comment of a Government attorney, "Does this check out?"

At the trial in 1964, agent Connors testified extensively with regard to information contained in an accounting summary he prepared which reflected the income and expenditures of the Key West Foundation during the period from November 1, 1959 to December 31, 1960. On *voir dire* examination conducted by defense counsel prior to the admission of the summary into evidence, agent Connors testified that this document and the underlying work sheets were not prepared until two weeks before he testified. He also testified that he had been instructed by the Government trial counsel that his summarization of the Key West Foundation records should terminate as of December 31, 1960. During this same examination, he admitted that he had destroyed work sheets which he had prepared earlier.[3]

At the hearing on remand in 1967, the Government produced a document prepared by agent Connors on October 8, 1963 which he characterized as a "memorandum."[4] This document disclosed the fact that around September 30, 1963 agent Connors had consulted with Government trial counsel "concerning accounting summaries [of the records of the Key West Foundation] to be prepared for the forthcoming trial. * * *" The document indicated that these summaries should reflect the "source of all funds" received by the Key West Foundation and the "disposition of such funds" for the period "10/27/59—4/30/61."[5]

---

2. That part of the log which is summarized in this statement reads:
 HYMIN was supposed to have used the money this way, he spent the money a little bit differently but it was spent. Do you understand, he said "I'll buy a hundred refrigerators."—instead of that he bought other things and bought other equipment, but he spent the money because he was renting apartments, conditions were different, * * *

3. Agent Connors' pertinent testimony at the trial on this subject is as follows:
 [By Mr. Walsh, defense counsel]
 Q. * * * when did you prepare the work sheets?
 A. Oh, about a week ago, sir, over a week, about ten days ago, sir.
 Q. I see.
 Did you have other work sheets prior to that time?
 A. I had various work sheets, yes sir, at that time.
 Q. Are they included in this Exhibit 105?
 A. No, sir, they were destroyed. They were not kept.
 Q. Well, were they destroyed after you showed them to the prosecutors or before?
 A. I don't recall, sir.
 Q. Why were they destroyed?
 A. Well, they were not to be used in connection with any results of an investigation.
 Q. How did you find that out?
 A. Discussion with the prosecutors.

 Q. They told you they didn't want to use those?
 A. Yes, sir.
 Q. Did they see them?
 A. I presume they saw them or we discussed them with them.
 * * * * *
 Q. Will you tell us why you end this statement as of December 31, 1959 [1960]?
 A. What [that] was the period of time I was requested to cover by government counsel, sir.
 * * * * *
 Q. But you had looked at the books for periods beyond that?
 A. I had access to them, yes, sir.
 Q. Well, had you examined them?
 A. Yes, I had looked at them.
 Q. And had you prepared work sheets for those longer periods?
 A. I would say I did prepare some, perhaps, yes, sir. I would say I prepared some work sheets for that period, yes.
 * * * * *

4. See note 7 infra.

5. In pertinent part, the October 8 document read:
 The A series of schedules will be captioned Total Funds Received and Disbursed by Teamster Pension Fund Loan Borrowers During Period Covered by Investigation. An individual schedule will be prepared * * * on each Pension Fund Loan Borrower to be included in the sum-

Furthermore, at the hearing, agent Connors again admitted (on cross-examination) that after he had consulted with the Government prosecutors, he had destroyed his work sheets prepared prior to those from which he testified at the trial. On this occasion, he also admitted that the destroyed work sheets had covered a period of time different from the period covered by those used at the trial.[6]

Testimony at the trial in 1964 by a defense accounting expert concerning the records of the Key West Foundation showed that the Key West Foundation had expended a large sum of money for building improvements and construction not only in 1960 but also in 1961. The work sheets which agent Connors prepared after consultation with the Government prosecutors around September 30, 1963 presumably also reflected the expenditures for both years. However, the accounting summary prepared by agent Connors, shortly before he testified at the trial but shortly after the Government was aware of the content of

mary (as will be identified below) covering the period from the time of their first receipt of Pension Fund loan proceeds through the complete expenditure of the last of such proceeds. These schedules will show the source of all funds received by the Borrower during this period and the disposition of such funds. An example of the format of one of these individual schedules, as will be utilized with regard to the Key West Foundation Company, Inc. loans, is as follows:

Key West Foundation Co., Inc.—
10/27/59—4/30/61

Source of Funds
 From Operations
 Teamster Pension Fund Loans
 Etc.
 Total
Disposition of Funds
 Operating Expenses
 Construction Costs
 Ben Dranow
 Abe I. Weinblatt
 S. George Burris
 Davis Trust Account
 (Orlando (Sun Valley)
 Etc.
 Total

6. Agent Connors' pertinent testimony at the hearing on this subject is as follows:
[By Mr. Walsh, defense counsel]

Q. Mr. Connors, you prepared worksheets, I assume, in order to reach the conclusions that you testified about yesterday?

A. Yes, sir, I did.

Q. And at the time that you testified in 1964, did you have all of the worksheets that you had prepared in the investigation?

 * * * * *

A. I don't believe I understand what you mean, Mr. Walsh, by "all the worksheets that I had."

Q. Which you had prepared in the investigation of the Poinciana and other properties related to Mr. Hyman?

A. I had some of them, yes, sir.

Q. Well, as I understand you, your answer is not yes, your answer is that you had some?

A. Yes.

Q. What happened to the others?

A. They had been destroyed.

Q. Now, did they cover a longer period than the one about which you testified at that time?

A. Some of those that had been destroyed had covered a longer period, yes, sir.

Q. And did that destruction occur after consultation with attorneys who were prosecuting the case?

A. I would say it occurred after one or more consultations, yes, sir.

 * * * * *

Q. They were schedules of abstracts that you made from the books?

A. Yes, sir.

Q. Were they different from the ones that were presented at the trial in any respect? I am not saying they were distorted, just different.

A. I don't think they were different, no sir.

Q. Did they cover different periods?

A. They would have covered perhaps a period—yes, a different period.

Q. So they were different in that respect?

A. Somewhat, yes, sir.

Q. Did you show those to the prosecutors?

A. I don't recall at this time precisely whether I showed them to them or whether they saw them by their own review of what we had or not.

 * * * * . *

the Burris-Sigelbaum conversation, did not reflect the 1961 expenditures.

The inferences from the foregoing facts are apparent. After the Government learned through the overheard conversation, that Hyman's defense would probably be that although he had used the Pension Fund loan proceeds "a little bit differently when he first obtained" them, he had "ultimately put * * * [them] into the property," the Government prosecutors instructed agent Connors to terminate his accounting summary of the Key West Foundation records as of December 31, 1960 and to destroy his previous work sheets which reflected a longer time period.

The Government insists, however, that it made no use of the overheard conversation. In support of this contention, the Government argues that its prosecutive theory was to show that defendant Hyman made "false representations to the Pension Fund that he [Key West Foundation] had, during 1960, incurred construction expenditures totalling over $700,000"; that evidence independent of agent Connors' testimony showed that no such construction expenditures had been incurred; and that agent Connors' testimony corroborated this evidence by showing that the Key West Foundation records indicated no disbursement of funds during 1960 for construction in the amount Hyman represented. In sum, the Government argues that what the Key West Foundation expended for construction in 1961 "was irrelevant to the government's theory. * * *"

The Government's argument misses the point. The facts contained in the Key West Foundation records were known by both the Government and the defendants. But what the Government did not know, save for the overheard conversation, was what Hyman intended to assert as a defense to the Government's charges. When the Government gained that knowledge, agent Connors, pursuant to the directions of the Government prosecutors, tailored his accounting summary and his testimony. Thus, the Government attempted to forestall or destroy the defense indicated in the overheard conversation, namely, that Hyman, regardless of what had gone on before, had ultimately invested the entire proceeds of the Pension Fund loans in improvements to and construction of the properties secured by the loans. These considerations demonstrate the lack of substance in the Government's contention.

The Government conceded that it had the burden at the hearing of showing that its illegal activities in respect to the eavesdropped conversation did not taint the convictions of the defendants. Silverthorne Lumber Company, Inc. v. United States, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920); United States v. Coplon, 185 F. 2d 629, 28 A.L.R.2d 1041 (2d Cir. 1950); United States v. Goldstein, 120 F.2d 485 (2d Cir. 1941), affd 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942). In my opinion, the Government did not meet that burden in this case.

## II.

At the trial, there was an understanding that Government counsel "would provide * * * [defense counsel with statements required by 18 U.S.C. § 3500] as soon as the witness takes the stand." Prior to the testimony of agent Connors at the trial, however, Government counsel proffered no section 3500 statements to defense counsel relating to his testimony. In response to defense counsel's queries to discover if any such statements were in existence, agent Connors denied that he had rendered "any report concerning * * * [his work]." Subsequent efforts by defense counsel to discover the existence of such statements were objected to. The district judge sustained the objection, saying, "You went all over that yesterday looking for 3500 statements."

Despite the Government's initial denial that agent Connors had prepared any reports, it was disclosed at the hearing conducted pursuant to the Supreme Court's remand that he had in fact prepared three reports in 1963 and 1964.

Two of the reports were the summaries, dated December 26, 1963 and January 11, 1964, of the electronically overheard Burris-Sigelbaum conversation. In the third report ("memorandum"),[7] written on October 8, 1963, agent Connors set forth the type of accounting summaries he was to prepare for use at the trial.

The defendants argue that by concealing the existence of these reports at the trial, the Government unilaterally determined whether the reports came within the purview of 18 U.S.C. § 3500, thereby usurping the district court's authority to make such determinations. The Government argues in reply that the defendants' claim of prejudice due to noncompliance with section 3500 "rests upon an unwarranted assumption as to the importance of agent Connors' direct testimony"; that the two summaries of the Burris-Sigelbaum conversation did not relate to agent Connors' direct testimony and were not within the purview of section 3500; that the summaries of the Burris-Sigelbaum conversation "added nothing to what the defense already knew"; and that "in any event, even if * * * [the] October 1963 memorandum were a statement of the witness [Connors] * * * within the reach of 18 U.S.C. 3500, it had negligible—if any —impeaching worth."[8]

I am unable to agree with the majority's resolution of the issues raised by the Government's failure to produce the three reports. After observing that agent Connors' reports failed to meet the requirements of 18 U.S.C. § 3500, the majority states, "the conclusion is inescapable that it had no impeachment value to the defendants."

In Rosenberg v. United States, 360 U. S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.

2d 1304 (1959), the Supreme Court said: "An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled." The question whether the "defense is entitled" to the production of a given statement is reserved for the determination of the district court. Thus, "when it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination." Palermo v. United States, 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959).

Both the *Rosenberg* and *Palermo* cases make clear that the Supreme Court viewed the district court, not Government counsel, as the arbiter of whether statements are producible under 18 U.S. C. § 3500. By refusing to admit that agent Connors had prepared any reports, the Government unilaterally usurped the district court's function in this regard. Bary v. United States, 292 F.2d 53, 58 (10th Cir. 1961). Irrespective of how the district court might have resolved the issue whether the reports in question were within the purview of 18 U.S. C. § 3500, it was improper and prejudicial[9] for the Government to preclude the court from ever reaching such a resolution.

I am likewise unconvinced by the majority's discussion of the defendants' contention that the Government's willful suppression of the three reports violated their rights to due process. In Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court said, "the suppression by

---

7. The Government argued that the October 8 document was "not a report on work," but rather a "memorandum" concerning "a conversation in which work was asked to be performed."

8. At the hearing, Government counsel tendered the October 8 statement in response to a defense request for the "3500 statements of the witness [Connors]."

9. As the defendants argue in their brief, if the defense counsel were aware that agent Connors both had knowledge of Hyman's proposed defense and had deliberately changed his work sheets and accounting analysis after gaining such knowledge, agent Connors' testimony might have been seriously impeached.

the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." I have already sought to demonstrate that the three reports were relevant and material to the defense. Thus, the willful suppression of these reports by the Government, standing alone, would seem to lead to the conclusion that the defendants' due process rights were violated. This conclusion is strengthened when the fact that agent Connors lied on the witness stand is also considered. Although agent Connors emphatically denied at the trial that he had made any reports during his investigation, he had in fact prepared and circulated the three reports in question, as he admitted at the hearing.

### III.

In its per curiam opinion, the Supreme Court remanded this cause to the district court to consider "any other electronically eavesdropped conversations." Hoffa v. United States, 387 U.S. at 233, 87 S.Ct. at 1584. Despite this explicit direction, the district court refused the request of the defendants for the production by the Government of all logs and reports of eavesdropped conversations of defense counsel. The Government took the position with regard to these requests that it was required to disclose only those eavesdropped conversations in which a defendant

10. Government counsel made the following statement to the district court:
Your Honor, the Government has made it plain in its memorandum in this case and its memorandum before the Supreme Court of the United States what the Government's disclosure policy is.

participated.[10] The Government's position was reiterated in its brief filed in this court. In response to a question from this court during the oral argument, Government counsel admitted that the Government possessed logs of eavesdropped conversations of certain defense attorneys. At the conclusion of the oral argument, Government counsel left with the Clerk of this court an envelope containing these logs, with instructions that the contents be made available only for the use of the court.

Two observations are in order with respect to the manner of the Government's disclosure of the logs of overheard conversations of the defense counsel. First, the Government's narrow and cavalier response to the Supreme Court's broad direction ought not to be condoned. Second, for reasons similar to those I expressed in my dissent in United States v. Battaglia, 7 Cir., 394 F.2d 327, decided April 10, 1968 on motion to remand, I believe that it is improper for this court to initially examine these logs, whether in camera or not, to determine their relevancy to the issues in this case.

### IV.

With regard to certain issues raised by the defendants in the original appeal in this case and reasserted by them in the present appeal, I adhere to both the reasoning and the suggested disposition expressed in my dissent in the original appeal. United States v. Hoffa, 367 F. 2d 698, 716 (7th Cir. 1966).

It is to disclose all arguably relevant materials which have thus obtained from conversations of defendant. That goes far beyond any legal requirements that are imposed upon the Government.